Albert **TANN**, husband, et al.

v.

**SERVICE DISTRIBUTORS, INC.**

**Civ. A. No. 70–1168.**

United States District Court,
E. D. Pennsylvania.

Sept. 29, 1972.

Herbert Monheit, Philadelphia, Pa., for plaintiffs.

Richard J. van Roden, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for defendant.

## MEMORANDUM OPINION AND ORDER

EDWARD R. BECKER, District Judge.

The motions for a new trial and for relief from judgment that we have before us stem from the trial of a motor vehicle personal injury case.[1] Plaintiff Lisa Tann ("Lisa"), age 12, was a passenger in a vehicle driven by her mother, plaintiff Bertha Tann, when it was struck in the rear by a vehicle driven by an employee of the defendant. The jury's verdict was for the plaintiffs. In addition to reimbursing the plaintiffs for their medical expenses, the jury awarded Lisa and Mrs. Tann $4,000 each for pain and suffering. Plaintiffs are disappointed in the amounts of the verdicts, particularly Lisa's, and have assigned the inadequacy thereof as ground for a new trial. The principal question before us, however, involves plaintiff's grievance as to the manner in which the Court handled the exigent situation that arose after commencement of the trial, when it was discovered that B. Marvin Hand, M.D., a neurologist who had examined Lisa on behalf of the defendant to evaluate the claim that she had suffered post-traumatic petit mal epilepsy, had been stricken with a grave illness and could not appear to testify.

The relevant facts may be summarized as follows.[2] The trial commenced on

1. The new trial motion is filed pursuant to F.R.Civ.P. 59, and the motion for relief from judgment is filed pursuant to F.R. Civ.P. 60(b).

2. Our factual references draw upon the notes of testimony and upon affidavits filed in support of the motions before us.

Friday morning, February 18, 1972. After the plaintiffs' case on liability was established, principally by the testimony of Mrs. Tann, and after Mrs. Tann's case with respect to her own personal injuries was concluded, the most substantial issue in the case, Lisa's personal injury claim, was taken up. Plaintiffs' principal witness was Dr. James Nelson, a neurologist and psychiatrist who had examined and treated Lisa, who testified that she indeed was suffering from petit mal epilepsy, which he attributed to the accident, in which Lisa had struck her head and briefly lost consciousness.[3] In the course of his testimony, Dr. Nelson relied heavily upon electroencephalogram (EEG) tests that he had performed, which he found to be abnormal. Moreover, Mrs. Tann and Lisa's third grade teacher testified to recurrent episodes during which Lisa seemed to lapse from attentiveness at home and in class; Dr. Nelson described such episodes as symptomatic of petit mal. It was also contended that Lisa's school performance, as reflected by her grades, was seriously affected by the accident. The gravity of Lisa's claim was underscored by Dr. Nelson's testimony that there was a fifty percent possibility that her condition would ultimately develop into a grand mal epilepsy condition.[4]

As part of plaintiffs' case, and before Dr. Hand's illness became known, plaintiffs' counsel, Herbert Monheit, Esq., read to the jury defendant's answer to a request for an admission in which defendant conceded that Dr. Hand had observed Lisa suffer a petit mal attack in his office (N.T. 103). However, apparently because it was Dr. Hand's ultimate conclusion that Lisa had sustained no structural brain injury at the time of the accident, Mr. Monheit had informed the Court in a chambers discussion immediately prior to trial that he did not intend to call Dr. Hand as a witness. Dr. Hand was, on the other hand, the sole clinician selected by defendant to examine Lisa, and during the course of the chambers discussion just referred to, defendant's counsel stated his intention to call Dr. Hand as a witness.

On Tuesday, February 22, 1972, after a weekend recess prolonged by a Monday holiday (Washington's Birthday), Richard J. van Roden, Esq., the attorney for the defendant, informed the Court that late on Friday, in the course of attempting to make arrangements for the precise time for Dr. Hand's appearance, he had learned that Dr. Hand was at home recovering from major surgery, which involved the removal of a malignant kidney. The Court thereupon instructed Mr. van Roden to seek further advice from Dr. Hand's wife as to his physical competency and, in a telephone conversation from the courtroom (out of the hearing of the jury), Mr. van Roden was informed that Dr. Hand was not physically able to appear in court to testify. Mr. van Roden represented that Dr. Hand's wife had expressed concern as to his ability to withstand the rigors of testifying and cross-examination, even if his testimony were taken by deposition at his home. She also informed Mr. van Roden that Dr. Hand was receiving daily cobalt treatments for his condition.

At that juncture, Mr. van Roden moved for leave to obtain another neurological examination of Lisa. Mr. Monheit requested that the defendant be precluded from such examination. During a conference in chambers late Tuesday afternoon, we expressed the view that, under the circumstances, another examination should be permitted, but de-

---

3. Petit mal epilepsy is a condition marked, *inter alia*, by brief attacks of unconsciousness, faintness, or vertigo. Dorland's Illustrated Medical Dictionary 1135 (24th ed. 1965).

4. Grand mal epilepsy is a severe form of epilepsy marked by attacks of violent convulsions and loss of consciousness. *Id.* 501.

ferred formal ruling on the matter until Wednesday morning, and directed Mr. van Roden to explore, in the interim, the possibility of obtaining a substitute physician. We also granted Mr. Monheit leave to file a formal motion to preclude examination, which he did on Wednesday morning. Mr. Monheit also moved that, in the event that the Court permitted such additional examination, a mistrial be granted.

At a conference in chambers on Wednesday morning, the entire matter was re-explored. In the interim, Mr. Monheit had discovered that Dr. Hand had been seeing a few patients at his office. Mr. van Roden confirmed this fact but represented that the purpose of these professional appointments was principally for occupational therapy for Dr. Hand and that they involved no rigors of any kind. We credited defendant's representation that Dr. Hand was unable to testify either in court or by deposition. Indeed, based upon Mr. van Roden's report, it seemed doubtful to us that he would ever be able to testify. We recited our reluctance to abort a trial so well under way and so ably and vigorously tried by both counsel. We also expressed the view that it would be grossly unfair to the defendant to force it to conclude the trial without the benefit of the testimony of another neurologist, having thus been deprived of Dr. Hand's testimony, especially in view of the fact that the aspect of Dr. Hand's testimony that was favorable to the plaintiffs was already before the jury by virtue of the answers to the requests for admissions. Accordingly, we granted the defendant leave to have Lisa examined by another neurologist. (Mr. van Roden, in the interim, had informed us that Donald Fishman, M.D. was available to make the examination.) However, we also required that Dr. Fishman's report be transcribed and delivered immediately to Mr. Monheit, who was granted leave to have Dr. Nelson re-examine Lisa

in the wake of Dr. Fishman's report for possible rebuttal. Because Ralph Chase, an expert witness scheduled to appear for the plaintiffs, had been stricken ill with a virus and was unable to appear for the time being, we recessed the trial until Monday, February 28, by which time the neurological examinations could be completed and Mr. Chase's deposition taken at his home in Doylestown, Pennsylvania. The motion for mistrial was denied.

Pursuant to the Court's ruling, Dr. Fishman examined Lisa on Friday, February 25 in the presence of Mr. Monheit, and a copy of Dr. Fishman's report was supplied to Mr. Monheit.[5] Mr. Monheit elected not to have Lisa re-examined by Dr. Nelson. When the trial resumed, Dr. Fishman appeared and testified. His testimony was to the effect that, while Lisa had suffered a brain concussion in the accident with attendant post-concussion difficulty, she had not suffered any permanent brain damage as a result of the accident. He also expressed the opinion that any decline in Lisa's school performance or any seizure condition which she might have (but of which he found no evidence) was unrelated to the accident. Defendant's other expert witness, Dr. Lorenzo Runk, who performed and evaluated an EEG test on Lisa at the request of Dr. Hand, testified that neither the EEG test performed by Dr. Nelson nor the one that he himself performed was abnormal.

The evidence upon which the defendant put the most stress, however, was Lisa's school records. Plaintiffs had introduced portions of the records to show that Lisa's school work had fallen off after the accident. However, defendant ultilized the records to show that Lisa's school work within a year following the accident and thereafter was the same or better than it had been before. In our view, this was extremely telling evidence on defendant's behalf, and it doubtless impressed the jury.

---

5. Mr. Chase's deposition was also taken and in due course it was read to the jury.

Supporting affidavits were filed with the post-trial motions. In pertinent part, they set forth the following. According to plaintiffs' affidavit, Dr. Hand saw five patients a day for neurological examinations on three days of each week from and after February 28, 1972, and drove himself to work on those days. Plaintiffs submit that this fact proves that Dr. Hand could have testified in court or at a deposition. The affidavit supplied by Dr. Hand, however, puts the matter in a different perspective.

Dr. Hand's affidavit sets forth that: (1) he was an inpatient at Chestnut Hill Hospital from February 4, 1972, until February 18, 1972; (2) on February 9, 1972, his malignant kidney was removed; (3) he remained bedridden at home following his discharge until February 25, when he got out of bed only to see the surgeon at his office; (4) he remained totally incapacitated at home until February 28, when he was examined at Hahnemann Hospital by Dr. Luther Brady, who recommended a course of cobalt radiation therapy five days a week to be administered at the hospital; (5) following the examination by Dr. Brady, he returned to his office on February 28 and saw several patients; (6) after that time he received the radiation therapy five days a week between 7:00 and 7:30 a. m.; (7) he was suffering from fatigue, exhaustion, nausea, and depression in addition to his post-malignancy condition, but despite these ailments he returned to limited professional activities; (8) he saw patients on a part-time basis three days a week (in contrast with his previous full five-day-a-week schedule), and he saw only four or five patients a day; and (9) his other professional activities were almost totally curtailed. Dr. Hand's affidavit concludes with the statement that because of his weakened physical condition and related fatigue, exhaustion, nausea, and depression, he was unable to testify and particularly to undergo cross-examination in connection with this case.

■ We turn first to plaintiffs' motion as to inadequacy of the verdict. Damages assessed by a jury are not to be set aside unless shocking to the judicial conscience or so grossly inadequate as to constitute a miscarriage of justice, Coleman v. Quaker State Coca-Cola Bottling Co., 328 F.Supp. 314 (E.D.Pa. 1971); Peterson v. Calmar Steamship Corp., 296 F.Supp. 8 (E.D.Pa.1969), or unless the jury's award indicates caprice or mistake or a clear abuse of its fact-finding discretion or the clear influence of partiality, corruption, passion, prejudice, or a misconception of the law, Mainelli v. Haberstroh, 237 F.Supp. 190 (M.D.Pa.1964), aff'd per curiam, 344 F. 2d 965 (3d Cir. 1965). The trial judge should be extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff. Mainelli v. Haberstroh, *supra.* Applying these principles to the facts of this case, we note the following.

■ With respect to Lisa's claim, the jurors were presented with a square conflict in the testimony. On one hand they had before them Dr. Nelson's opinion that Lisa had incurred a petit mal condition as a result of the accident. On the other hand they had before them the testimony of Dr. Runk that all of Lisa's EEG's were perfectly normal; Dr. Fishman's testimony that Lisa had not contracted petit mal epilepsy as the result of the accident; and the school records tending to show that Lisa was a poor student before the accident and was afterwards as good or better a student than before. Needless to say, a jury may accept or reject such testimony as it deems proper. Weinstein v. Stryker, 267 F.Supp. 34 (E.D.Pa.1967). This rule applies even though the testimony is uncontradicted and unrefuted. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 64 S.Ct. 724, 88 L.Ed. 967 (1944);

Rhoades, Inc. v. United Air Lines, Inc., 340 F.2d 481 (3d Cir. 1965); Lambert v. Duzy, 286 F.Supp. 670 (E.D.Pa.1968). The jury's verdict reflects its rejection of the claim that Lisa was suffering from epilepsy caused by the accident. The medical dispute presented a classic jury question, and there certainly was ample evidence to support the jury's rejection of the epilepsy claim. While defendant did not dispute that Lisa had sustained a brain concussion in the accident, the verdict for Lisa of $4,000 plus medical expenses of $450 does not represent grossly inadequate compensation for such an injury. The verdict thus does not shock our conscience and cannot be set aside.

■ The testimony as to Mrs. Tann's injuries was that she suffered soft tissue injuries to the neck and back including an aggravation of her previously dormant but congenital lower back abnormality, as well as some stomach distress. There was evidence that she was complaint-free by October or November 1968, four months after the accident. She had no lost earnings, and the jury reimbursed her medical expenses of $965. For these reasons, our conscience is not shocked by the $4,000 pain and suffering award, and it too cannot be set aside as inadequate.

We turn to plaintiffs' motions insofar as they are based upon our actions with respect to Dr. Hand's illness. Plaintiffs' specific complaints are that we erred in: (1) not permitting the taking of the deposition of Dr. Hand; (2) refusing to suppress the examination by Dr. Fishman; and (3) informing the jury that Dr. Hand was gravely ill and unable to testify.

■ A trial judge has discretion to order a new trial when he is convinced that the judicial process has resulted in the working of an injustice upon any of the parties. Lewin v. Metropolitan Life Ins. Co., 257 F.Supp. 506 (E.D.Pa.1966), rev'd on other grounds, 394 F.2d 608 (3d

Cir. 1968). Moreover, rule 60(b) provides (in pertinent part):

> (b) *Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc.* On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. . . .

It is apparent from even a cursory reading that parts (1) through (5) of rule 60(b) are inapplicable here. Rule 60(b)(6) confers upon the Court discretion to grant relief for "any other reason justifying relief from the operation of the judgment." The rule should be liberally construed when the judge, in the exercise of his sound discretion, believes that justice will be accomplished by the vacating of the judgment. Klapprott v. United States, 335 U.S. 601, 614–615, 69 S.Ct. 384, 93 L.Ed. 266, modified, 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 1099 (1949); Cavalliotis v. Salomon, 357 F.2d 157, 159 (2d Cir. 1966); Radack v. Norwegian America Line Agency, Inc., 318 F.2d 538, 542 (2d Cir. 1963); United States v. Gould, 301 F.2d 353, 357 (5th Cir. 1962); Tozer v. Charles A. Krause Milling Co., 189 F.2d 242, 244 (3d Cir. 1951). But rule 60(b) is not intended as a substitute for a

new trial motion, or for an appeal, or to allow reconsideration of questions already litigated and decided. United States v. Gould, *supra*; United States v. McCoy, 198 F.Supp. 716, 723 (W.D. N.C.1961). Rather, it is a broad remedy created to make possible the correction of injustice in extraordinary, exceptional cases. Ackermann v. United States, 340 U.S. 193, 71 S.Ct. 209, 95 L. Ed. 207 (1950); Klapprott v. United States, *supra*; Federal Deposit Ins. Corp. v. Alker, 30 F.R.D. 527 (E.D.Pa. 1962), aff'd per curiam, 316 F.2d 236 (3d Cir.), cert. denied, 375 U.S. 880, 84 S.Ct. 150, 11 L.Ed.2d 111 (1963).

■ In the leading case of Klapprott v. United States, *supra*, the Supreme Court approved relief to an immigrant against whom a default judgment had been entered while he was ill, penniless, and in prison, and a letter asking an attorney to defend his case had been intercepted and confiscated by the government. And in Federal Deposit Ins. Corp. v. Alker, *supra*, relief was ordered where a party, due to an error by the clerk of the court, had no formal, actual, or constructive notice of the proceedings. This case poses no such extraordinary or unusual circumstances. To the contrary, in this situation, the rule 60(b) motion does not present any additional grounds for relief not already before us on the rule 59 motion for new trial. In support of our view that the plaintiffs are not entitled to a new trial or other relief, we make the following observations:

First, our decision not to order the testimony of Dr. Hand rested simply on compassion for a human being suffering from an illness of awesome gravity. Having reviewed Dr. Hand's affidavit, we are satisfied that he was in no position to testify. Our concurrent decision to permit the examination and testimony by Dr. Fishman was dictated by fundamental fairness. By virtue of the answer to their request for admissions, plaintiffs had already gotten the favorable part of Dr. Hand's report into evidence without the unfavorable portion. Defendant had no other physician with whom to combat plaintiffs' claims. Defendant was given no undue advantage by Dr. Fishman's fresh examination, not only because plaintiffs had the right to offset it by a still later examination by Dr. Nelson, but also because the shortage of time precluded the comprehensive examination with subsidiary testing that Dr. Fishman otherwise might have performed, and accordingly his efficacy as a witness was impaired. We note in this regard that Mr. Monheit conducted an exceptionally effective cross-examination on precisely this gound. We believe that the *defendant* would have been entitled to a new trial had we *not* permitted an examination of Lisa by Dr. Fishman. While we might view the situation differently were we to find that the defendant acted in bad faith, we credit Mr. van Roden's representations and affidavit as to his late discovery of Dr. Hand's condition, and find no bad faith.

Second, in their rule 60(b) motion, plaintiffs have alleged that had they known that Dr. Hand was unavailable, they would have preferred to postpone the trial, for (they contend) they considered Dr. Hand a most important witness for them. This argument might have some force had plaintiffs sought to call Dr. Hand as a witness, but, as we have noted above, they had determined not to and so informed the court. Indeed, had defendant determined *not* to call Dr. Hand, plaintiffs would have been remediless even without his illness. By the time the Hand episode occurred, the trial was well underway; substantial sums had been expended for expert witnesses who had already testified, and commitments had been made to others. The trial had been unusually contentious, and we were of the view that the interests of justice would be served best if the trial were concluded during the then current sitting, since it did not appear that Dr. Hand would ever be able

to appear. Moveover, we were satisfied that a fair trial was in the making and that nothing could be gained, while much would be lost, if the trial were postponed.

 Third, we informed the jury that Dr. Hand was ill because the jury might otherwise have drawn some improper inference from his failure to testify. They were doubtless expecting him to appear, having already heard references to his findings during opening statements by both sides (N.T. 29, 42). A federal trial judge has a much broader function than simply ruling on objections and charging the jury. His duty is to conduct the trial in a manner calculated to elicit the truth and attain a just resolution of the dispute between the parties. Specifically, he is obligated to see that the issues are not obscured and that the testimony is not misunderstood. Cromling v. Pittsburgh & L. E. R. R., 327 F.2d 142, 151–152 (3d Cir. 1963). Furthermore, neither party objected at the time we made the statement to the jury, and so this tardy objection is to be rejected solely by reason of its untimeliness unless plain error was committed. *See* Kuzma v. United States Rubber Co., 323 F.2d 657 (3d Cir. 1963). We believe the explanation to the jury was an exercise in fundamental fairness and was not error of any sort, much less plain error.

Plaintiffs have also asserted that we erred in not telling the jury that an inference adverse to defendant could be drawn from Dr. Hand's failure to appear. In view of Dr. Hand's malady, such a contention is ill conceived as well as lacking in merit.

A careful review of the record fails to indicate that the judicial processes operative in this case have worked an injustice upon any of the parties. In our view, the case was fully and fairly tried. Finding no grounds for a new trial or for relief from judgment under rule 60(b), we enter the following Order:

And now, this 29th day of September 1972, the plaintiffs' motions for new trial and for relief from judgment are denied.