**NEW MARKET INVESTMENT CORPORATION, Plaintiff,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant.**

Civ. A. No. 90–1537.

United States District Court, E.D. Pennsylvania.

Sept. 30, 1991.

Deborah F. Cohen, Matthew Adler, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

James C. Stroud, Catherine H. Agnew, Rawle & Henderson, Philadelphia, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

The plaintiff, New Market Investment Corporation, is a Pennsylvania corporation and successor in interest to Frupac International Corporation, an importer of Chilean fruit to the United States, principally through the port of Philadelphia. The plaintiff was referred to at trial as "Frupac", and the Court will so refer to the plaintiff in this Memorandum. The defendant, Fireman's Fund Insurance Company ("Fireman's Fund"), is a Delaware Corporation engaged in the business of insurance. Fireman's Fund insured Frupac's fruit shipped from Chile to its customers in the United States under Open Marine Cargo Policy 16826 (the "policy"). Frupac brought this action under the policy as a result of Fireman's Fund's refusal to cover losses incurred by Frupac during what has come to be known as the "Chilean Grape Crisis" of 1989.

The parties began a five-day bifurcated jury trial before this Court on April 22, 1991. At the end of the liability phase of the trial, the jury returned a verdict in favor of the plaintiff, Frupac. At the end of the damages phase of the trial, the jury assessed the amount of Frupac's damages at $217,218.00.

Both parties filed post-trial motions. Fireman's Fund filed a Motion for Judgment Notwithstanding the Verdict as to Liability Only or, in the alternative, for a New Trial as to Liability Only. Frupac filed a motion for a New Trial on the Issue of Damages Only.

I. Fireman's Fund Post-trial Motions as to Liability

The evidence presented at the liability phase of trial revealed the following:

On March 2, 1989, the United States Embassy in Santiago, Chile, received an anonymous telephone call in which the caller threatened that fruit bound for the United States from Chile had been injected with cyanide. The caller told embassy personnel the fruit had been poisoned in order to protest the plight of the Chilean poor and to bring economic injustice in Chile to the attention of the United States and the world. The threat was reported immediately to the Department of State in Washington, D.C., where it was disseminated through various channels to relevant government departments and agencies, including the United States Customs Service ("Customs"), the Department of Health and Human Services ("HHS"), and the Food and Drug Administration ("FDA"). Among the channels through which the news of the phone threat was disseminated was the "TERREP" channel, an intergovernmental reporting system designed to notify a pre-arranged network of United States agencies of international terroristic activities.

As a result of the anonymous call, on March 4, 1989, the FDA and Customs temporarily halted importation of Chilean fruit to the United States. This halt was quickly lifted upon the Department of State's preliminary conclusion that the threat was likely a "hoax".

On March 6, 1989, the United States Embassy in Santiago received a second telephone threat from an anonymous caller, identified by embassy personnel as the same person responsible for the March 2nd threat. As a result of this second threat, the FDA increased visual inspection levels for all Chilean fruit arriving in United States ports.

After implementation of the increased inspection levels, on March 12, 1989, two seedless red Chilean grapes that had arrived in the port of Philadelphia on the ship *Almeria Star* were reported by inspectors to have a suspicious appearance. The grapes were tested in an FDA laboratory and discovered to have been contaminated with cyanide.

In response to this discovery, on March 13, 1989, the FDA issued a press release announcing that it had confirmed the presence of cyanide in the two Chilean grapes. The press release advised consumers to avoid eating any fruit from Chile. The press release stated that "[a]s a result of yesterday's discovery, the entire shipment on the *Almeria Star* was detained, and as of today [March 13, 1989], all Chilean fruit was under detention to permit the FDA, U.S. Department of Agriculture and the Chilean fruit industry to inspect the fruit at least until the situation can be clarified."

Cooperative efforts on the part of the FDA and the American Produce Association ("AMPRO"), a trade association of Chilean fruit importers of which Frupac was a member, established a comprehensive inspection program for Chilean fruit. Inspection levels varied according to when the fruit was picked and packed in relation to the terroristic threats. The inspection plan, as explained in a March 17, 1989 press release issued by the FDA, consisted of a three-prong response to the crisis:

1. Any Chilean fruit which had entered the United States and then cleared United States ports would be destroyed.

2. Fruit currently at United States ports or en route to the United States was subject to increased inspection levels.

3. Fruit in Chile would be subject to increased security and inspection levels before shipment to the United States.

The increased inspection levels were implemented through the cooperative efforts of the FDA and the importers. The inspection program continued until April 14, 1989, when the FDA issued a press release confirming the "return to normal" of Chilean fruit importation.

Despite all efforts to ensure the safety of Chilean fruit as well as to restore consumer confidence, Frupac suffered substantial losses. Much of its fruit eventually spoiled, was destroyed, or was so damaged by inspection that it had to be destroyed. Frupac also gave credits to some of its customers who were unable to sell fruit which had already been delivered to them and was either returned to Frupac or destroyed by the customers.

As a result of its losses, Frupac notified Fireman's Fund of its claim under its insurance policy, Open Marine Cargo Policy 16826. During all times relevant hereto, Open Marine Cargo Policy 16826 ("policy") was in effect. The policy was issued to Frupac by Fireman's Fund and contained a Strikes, Riots, and Civil Commotions Endorsement ("S.R. & C.C. Endorsement"), under which Frupac seeks coverage for its losses. Frupac presented testimony that it was motivated to obtain the coverage provided in the S.R. & C.C. Endorsement by acts of terrorism which had occurred in Chile, particularly, the fire bombing of a truck in 1985. The S.R. & C.C. Endorsement reads in relevant part as follows:

S.R. & C.C. ENDORSEMENT
(Form No. 9)

THIS INSURANCE ALSO COVERS:

\* \* \* \* \* \*

(2) destruction of, or damage to, the property insured directly caused by *vandalism, sabotage, or malicious act,* which shall be deemed also to encompass the act or acts of one or more persons, whether or not agents of a sovereign power, *carried out for political, terroristic or ideological purposes* and whether any loss, damage or expense resulting therefrom is accidental or intentional; PROVIDED that any claim to be recoverable under this sub-section (2) be not excluded by the FC & S warranty in the policy to which this endorsement is attached.

\* \* \* \* \* \*

Nothing in this endorsement shall be construed to cover any loss, damage, deterioration or expense caused by or resulting from:

. . . . .

c. delay or loss of market,

. . . . .

Effective with respect to shipments made on or after January 1, 1987.

(S.R. & C.C. Endorsement, Form No. 9) (emphasis added).

At trial, Frupac contended that all of the losses it incurred as a proximate result of the acts of terrorism described above were covered under the S.R. & C.C. Endorsement. Fireman's Fund, on the other hand, contended that the S.R. & C.C. Endorsement provided coverage for physical damage only, and, therefore, the only losses for which Fireman's Fund could possibly be liable under the Endorsement were the two grapes actually injected with cyanide. Fireman's Fund also argued that the delay, loss of market, and Free from Capture and Seizure provisions of the policy excluded Frupac's loss from coverage as a matter of law.

At an early stage of the trial, after receiving the proffers of the parties, the Court held a hearing outside the presence of the jury, for the purpose of determining whether the words of the policy could reasonably admit of different meanings thus presenting a question of fact to be resolved by the jury. However, after the hearing, the Court determined that there was no issue for the jury concerning the interpretation of either the S.R. & C.C. Endorsement or the remainder of the policy. The Court found that Fireman's Fund failed to present any reasonable alternative interpretation of the endorsement or the policy.

The Court found that the S.R. & C.C. Endorsement and the other provisions of the policy were not ambiguous. In making this determination, the Court was guided by *Eastern Associated Coal v. Aetna Cas. & Sur.*, 632 F.2d 1068 (3d Cir.1980), in which the Court of Appeals for the Third Circuit set forth several general rules of insurance policy interpretation under Pennsylvania law:

> The rules relating to the analysis of insurance policies in Pennsylvania are well established. Since the policy is a contract, the court's duty is to ascertain the intent of the parties as manifested in the language of the agreement. *Mohn v. American Cas. Co. of Reading*, 458 Pa. 576, 326 A.2d 346 (1974); *Lovering v. Erie Indem. Co.*, 412 Pa. 551, 195 A.2d 365 (1963); *Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co.*, 583 F.2d 650, 652 (3d Cir.1978). The court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits. *Pennsylvania Manufacturer's Association Ins. Co. v. Aetna Casualty & Sur. Ins. Co.*, 426 Pa. 453, 457, 233 A.2d 548, 551 (1967); *Kattelman v. National Union Fire Ins. Co.*, 415 Pa. 61, 64, 202 A.2d 66, 67 (1964). A court should not torture the language of the policy in order to create ambiguities. *Urian v. Scranton Life Ins. Co.*, 310 Pa. 144, 165 A. 21 (1933). If the language is unambiguous, interpretation of the contract is a matter of law for the court. *Adelman v. State Farm Mut. Auto. Ins. Co.*, 255 Pa.Super. 116, 123, 386 A.2d 535, 538 (1978); *Blocker v. Aetna Cas. & Sur. Co.*, 232 Pa.Super. 111, 114, 332 A.2d 476, 477–78 (1975).

632 F.2d at 1075.

Thus, the Court determined that (1) physical damage is not a prerequisite to liability under the S.R. & C.C. Endorsement, and (2) the only issue which required a factual determination by the jury was whether the alleged acts of terrorism were the proximate and real efficient cause of Frupac's loss.

After hearing the evidence presented in the liability phase of the trial, the jury answered the following three special interrogatories prepared by the Court:

1. DO YOU FIND THAT THE PLAINTIFF, NEW MARKET, HAS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT IT SUSTAINED A LOSS PROXIMATELY CAUSED BY ACTS OF TERRORISM WHEN THE FOOD AND DRUG ADMINISTRATION ORDERED THE DESTRUCTION OF ITS FRUIT?

    YES _____ NO _____

2. DO YOU FIND THAT THE PLAINTIFF, NEW MARKET, HAS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT IT SUSTAINED A LOSS PROXIMATELY CAUSED BY ACTS OF TERRORISM WHEN IT CREDITED ITS CUSTOMERS FOR FRUIT WHICH ITS CUSTOMERS COULD NOT SELL DUE TO CONSUM-

ER FEAR THAT THE FRUIT MIGHT BE POISONED?

YES _____ NO _____

3. DO YOU FIND THAT THE PLAINTIFF, NEW MARKET, HAS PROVED BY A PREPONDERANCE OF THE EVIDENCE THAT IT SUSTAINED A LOSS PROXIMATELY CAUSED BY ACTS OF TERRORISM WHEN ITS FRUIT DETERIORATED AND WAS DESTROYED, WHICH FRUIT WAS NOT SALEABLE DUE TO CONSUMER FEAR THAT THE FRUIT MIGHT BE POISONED?

YES _____ NO _____

The jury answered "yes" to all three interrogatories, thus finding Fireman's Fund liable to Frupac under the S.R. & C.C. Endorsement.

In its post-trial motions, Fireman's Fund contends that (a) this Court's holding that physical damage is not a prerequisite for liability under the S.R. & C.C. Endorsement was incorrect, (b) the Free from Capture and Seizure Warranty, as well as the Delay or Loss of Market provisions in the policy cover sheet and in the S.R. & C.C. Endorsement, exclude coverage for Frupac's losses as a matter of law, and (c) Frupac failed to meet its burden of proof.

### a. *Physical Damage Prerequisite*

■ Fireman's Fund contends that this Court's holding that physical damage is not a prerequisite for liability under the S.R. & C.C. Endorsement was incorrect. Fireman's Fund claims that the terms "damage" and "directly caused by" as used in the S.R. & C.C. Endorsement mean that only "physical damage" to the fruit is covered and that therefore, Fireman's Fund is liable under the policy only for fruit physically damaged, i.e., grapes actually injected with cyanide.

Other provisions of the policy specifically employ the term "physical" to modify the type of damages covered by that provision. For example, the warehousing clause, p. 12, ¶ 50, specifically states "cargo is insured against all risks of *physical* loss or damage from any external cause irrespective of percentage."; the Cargo Under Deck clause, page 4(b), ¶ 12(a), specifically states that "cargo is insured against all risks of *physical* loss or damage from any external cause irrespective of percentage."; the Air Shipments clause, page 4(b), ¶ 12(a), similarly states "insured against all risks of *physical* loss or damage from any external cause irrespective of percentage."; the Deliberate Damage—Pollution Hazard clause, page 10, ¶ 42, specifically states "*physical* loss or damage." (emphasis added in all quotes).

Clearly, the parties knew how to limit coverage to *physical* damage or *physical* loss where that was their intent. The S.R. & C.C. Endorsement uses the words "destruction of, or damage to." This language cannot reasonably be interpreted to mean that physical damage is a prerequisite to liability under an endorsement which purports to cover acts of terrorism. The Court will not torture the clear meaning of the words of the policy to create ambiguities where none exist.

### b. *Exclusions under the Policy*

Fireman's Fund next challenges the Court's interpretation of the S.R. & C.C. Endorsement by contending that the Free from Capture & Seizure clause, and the delay and loss of market clauses found in both the cover sheet to the policy and in the S.R. & C.C. Endorsement apply to exclude coverage as a matter of law even in the face of the jury's finding that the acts of terrorism were the proximate and real efficient cause of Frupac's loss.

■ The S.R. & C.C. Endorsement was purchased subsequent to the original policy. The S.R. & C.C. Endorsement prevails over any conflicting provisions in the cover sheet or policy. 1 *Couch on Insurance* 2d ¶ 4:36, pp. 399–402 (collecting cases). The S.R. & C.C. Endorsement contains specific provisions addressing delay and loss of market. It is those provisions which must be interpreted with respect to coverage under the Endorsement rather than the delay and loss of market provisions set forth in the cover sheet or elsewhere in the policy.

The Court instructed the jury to determine whether the alleged acts of terrorism were the proximate and real efficient cause of Frupac's loss. The Court also instructed the jury that Fireman's Fund was claiming that the acts of terrorism were not the proximate and real efficient cause of Frupac's loss, and that Frupac's losses were excluded under delay and loss of market provisions set forth in the S.R. & C.C. Endorsement. By answering "yes" to all three interrogatories, the jury found that the proximate and real efficient cause of Frupac's losses was the acts of terrorism, and not delay, loss of market, or the actions of the government.

The Court expressly permitted Fireman's Fund to argue to the jury whatever alternative proximate, real efficient causes it chose. In instructing the jury with respect to causation, the Court explained:

> The defendant claims that the acts of terrorism were not the proximate cause of the plaintiff's loss.

> Defendant takes the position that losses were proximately caused by the orders and the press release of the Food and Drug Administration and it also claims that the losses being claimed by the plaintiff in this case are excluded under the terms of that endorsement, that section that excludes delay and loss of market.

(N.T., pp. 45–46, April 25, 1991).

■ As explained to the jury in the Court's charge, the proximate and real efficient cause of a loss is not merely any one of a number of causes that were a substantial factor in bringing about the plaintiff's loss. Rather, proximate and real efficient cause is the predominant and determining cause of the loss. Guided by *Lanasa Fruit Steamship and Importing Co. v. Universal Insurance Co.*, 302 U.S. 556, 58 S.Ct. 371, 82 L.Ed. 422 (1938), the Court defined proximate cause for the jury as follows:

> Now, I'm going to tell you how the law defines proximate cause; particularly proximate cause in connection with insurance.

> It means the predominant and determining cause. It's also been defined as the real efficient cause. Those words are interchangeable and also I want to tell you that the cases say the proximate cause is not necessarily that cause which is nearest in time to the damage, but rather proximate cause is the one cause which is the predominant or efficient cause.

(N.T., p. 46, April 25, 1991).

■ Proximate cause was an issue for the jury. *Commodities Reserve v. St. Paul Fire & Marine Insurance Co.*, 879 F.2d 640, 644–45 (9th Cir.1989); *citing Union Insurance Company of Philadelphia v. Smith*, 124 U.S. 405, 8 S.Ct. 534, 31 L.Ed. 497 (1888); *Milwaukee, & St. Paul Railway Co. v. Kellogg*, 94 U.S. (4 Otto) 469, 474–76, 24 L.Ed. 256 (1877).

The jury determined that the acts of terrorism were the proximate and real efficient cause of Frupac's losses. The jury's verdict was fully supported by the evidence presented at trial.

### c. *Frupac's Burden of Proof*

[5] Fireman's Fund's only remaining challenge to the verdict against it is that Frupac failed as a matter of law to meet its burden of proof. The thrust of this argument is that Frupac was unable to prove that any terroristic threats or acts had occurred without the use of certain documents which Fireman's Fund contends were admitted into evidence contrary to the rules against the admission of hearsay. F.R.E. 801(c) & 802. The documents at issue, Exhibits 1–8 at trial, are all certified as copies of official government documents currently on file at the United States General Accounting Office, the Department of State of the United States of America, the United States Food and Drug Administration, or the United States Information Agency. Each document was certified under the seal of the relevant government agency or department and authenticated by the responsible officer at each department or agency. All of the documents are self-authenticating documents pursuant to the

requirements of Federal Rule of Evidence 902(1) & (4).

The first basis for the admission of these documents is the exception to the hearsay rule found in Rule 803(8) of the Federal Rules of Evidence, entitled "Public Records and Reports". All of the documents reported matters observed by individuals employed by the government departments and agencies pursuant to a duty imposed on them by law, and in many cases reported factual findings made by those departments and agencies. The reports in question, particularly Exhibit 1, a report of the United States General Accounting Office entitled "Food Tampering: FDA's Actions on Chilean Fruit Based on Sound Evidence", contain conclusions and opinions of those responsible for the report. This does not prevent the report from fitting under the Rule 803(8) exception. "[F]actually based conclusions or opinions are not on that account excluded from the scope of Rule 803(8)(C)." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 446–448, 102 L.Ed.2d 445 (1988). No information or circumstances indicate that the evidence in Exhibits 1–8 was untrustworthy.

Courts have admitted similar government documents under Rule 803(8). The United States Supreme Court, in *Beech Aircraft Corp. v. Rainey*, adopted a broad interpretation of Rule 803(8) and affirmed the admission of a JAG Report that contained factual findings as well as opinions and inferences based upon those findings. 488 U.S. 153, 109 S.Ct. 439, 446–450; *see also United States v. Versaint*, 849 F.2d 827, 832 (3d Cir.1988); *United States v. American Telephone and Telegraph Co.*, 498 F.Supp. 353, 364 (D.D.C.1980).

The Court therefore admitted Exhibits 1–8 into evidence under the exception to the hearsay rule codified in Rule 803(8) of the Federal Rules of Evidence.

Additionally, the statements contained in Exhibits 1–8 do not violate the hearsay rule in that they were not offered for the truth of the matter asserted, but rather to show the fact they were made and to demonstrate the effect they had on those who heard them or heard their repetition. *N.L.R.B. v. National Car Rental System, Inc.*, 672 F.2d 1182, 1887 (3d Cir. 1982). The truth of these statements, i.e., whether the terrorist actually had tainted fruit with cyanide, is irrelevant to their admission into evidence. Rather, the importance of the documents and the rationale for their admission is to demonstrate the fact they were made and the effect they had upon those who heard them, regardless of whether they were true or not. These documents therefore are not excluded by the Hearsay Rule.

Accordingly, for the reasons set forth above, the motion of the defendant, Fireman's Fund Insurance Co., for Judgment Notwithstanding the Verdict as to Liability Only or, in the alternative, for a New Trial as to Liability Only, will be denied.

## II. Frupac's Post-trial Motion as to Damages

Frupac filed a motion for a New Trial on the Issue of Damages Only. In its motion, Frupac contends the damages verdict was inadequate and against the clear weight of the evidence presented at trial.

The damages phase began with an agreement between the parties that three provisions of the insurance policy controlled the determination of damages under the policy. Those provisions are (1) clause 6, page 2, entitled "VALUATION", (2) clause 28, page 8, entitled "SUE & LABOR", and (3) clause 46, page 11, entitled "DEBRIS REMOVAL AND EXTRA EXPENSES".

In the damages phase, Frupac presented evidence that it had sustained a total loss of approximately $10,772,896.25 based on the United States Department of Agriculture's Daily Market Reports for the port of New York City. Frupac subtracted from this amount $5,342,444.00 which it admitted having received from the Chilean government in reimbursement for its losses. This left Frupac with a claim of approximately $5,430,452.25 using the New York market report values. Frupac also presented evidence that the amount of its claim using Philadelphia market report values was $4,916,252.25.

Fireman's Fund's damage case was based on its contention that Frupac had overvalued its loss. Fireman's Fund presented testimony that the total amount of Frupac's damages was $5,323,327.00. Fireman's Fund argued to the jury that since Frupac had been reimbursed by Chile in the amount of $5,342,444.00, Frupac had already received $19,117.00 more than it was entitled to in damages.

At the completion of the damage phase, the jury was left with a range of damages from $4,916,252.25 to negative $19,117.00. Their deliberations led them to a verdict of $217,218.00.

### a. *The Jury's Verdict*

Frupac contends it is entitled to a new trial on the ground that the jury's verdict was insufficient and against the clear weight of the evidence presented at trial.

■ A court may grant a motion for a new trial if the verdict is inadequate as a matter of law or if the size of the verdict is against the weight of the evidence. C. Wright, A. Miller, *Federal Practice and Procedure,* vol. 11, § 2807, p. 50 (1973). However, new trials on the basis that the verdict was against the clear weight of the evidence "are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir.1991).

> The court is not free to set aside the verdict merely because the judge might have awarded a different amount of damages, but it may do so if the proceedings have been tainted by appeals to prejudice or if the verdict, in the light of the evidence, is so unreasonable that it would be unconscionable to permit it to stand.

C. Wright, A. Miller *Federal Practice and Procedure,* pp. 52–53, § 2807; *see also Shanno v. Magee Indus. Enterprises, Inc.,* 856 F.2d 562, 567 (3d Cir.1988). Clearly, a trial judge must be "extremely reluctant to interfere with the time-honored power of the jury, in the exercise of its collective judgment, to assess the damages sustained by the plaintiff." *Tann v. Service Distributors, Inc.,* 56 F.R.D. 593, 598 (1972) (Becker, J.).

■ It is not this Court's prerogative to substitute its own judgment as to the amount of damages for that of the jury. Thus, regardless of whether the trial judge agrees or disagrees with the jury's verdict, the verdict must be upheld so long as it is supported by a "minimum quantity of evidence from which a jury might reasonably [decline to] afford relief." *Ford Motor Co. v. Summit Motor Products, Inc.,* 930 F.2d 277, 290 (3d Cir.1991).

■ The amount of the verdict in this case was not against the weight of the evidence, and the jury's verdict did not result in a miscarriage of justice. Fireman's Fund argued to the jury: (1) that Frupac incorrectly computed its damages using New York market prices rather than Philadelphia prices as required by the policy, (2) that Frupac incorrectly assumed that all of its fruit was in the higher range of market prices, (3) that Frupac incorrectly assumed that they would have sold each and every piece of fruit imported at the higher market price, and (4) that Frupac incorrectly valued fruit destroyed in Chile using United States market prices rather than the value of the fruit in Chile, which was significantly lower. Frupac had the burden of proof as to the amount of its damages. The jury made their findings on the basis of their judgment as to the credibility and weight they felt the evidence deserved. Such determinations are well within the province of the jury and provide no basis for a new trial. The mere fact that neither the plaintiff nor the Court has been able to mathematically deduce how the jury arrived a such a figure does not mandate that the jury's verdict should be overturned or a new trial awarded by this Court.

■ In its post-trial motion, Frupac contends that the testimony of the expert for Fireman's Fund was "unfounded" and therefore cannot amount to the minimum quantity of evidence necessary to support the jury's verdict. However, it is well-

settled under the caselaw and clear under Rule 103(a)(1) of the Federal Rules of Evidence that the failure to timely object to the admission of evidence constitutes a "waiver" of such objection for purposes of post-trial review. *See* C. Wright & K. Graham, *Federal Practice and Procedure* § 5033, p. 162 (discussing "waiver" theory).

Accordingly, Frupac's motion for a new trial on the basis that the verdict was insufficient and against the weight of the evidence will be denied.

#### b. *The Court's Jury Instructions on Damages*

Frupac contends that the Court erred in its instructions to the jury regarding valuation of damages. Specifically, Frupac contends that the Court erred when it denied their requested to charge the jury (1) that New York U.S.D.A. prices should be used to value damages, (2) that the jury could find Fireman's Fund waived the requirement that Philadelphia prices would be used for valuation, and (3) that the jury must apply a sum certain of $514,200.00 as the offset between New York and Philadelphia valuations of damages.

The Court instructed the jury that the policy required the Philadelphia Wholesale Fruit and Vegetable Reports must be used in the valuation of Frupac's claim. The Court also charged that the evidence presented by Frupac in connection with Fireman's Fund's alleged waiver of the Philadelphia valuation requirements of the policy was insufficient as a matter of law to create a factual issue for the jury. Furthermore, the Court refused to charge the jury with regard to a sum certain difference between Philadelphia and New York market prices, since that determination involved questions of credibility and the weight to be given to evidence. The Court properly refrained from deciding such factual issues for the jury.

The jury's finding of damages in the amount of $217,218.00 was neither unreasonable nor a miscarriage of justice. This Court therefore will not disturb the jury's verdict.

Accordingly, for the reasons set forth above, the Motion for a New Trial on the Issue of Damages Only of the plaintiff, New Market Investment Corporation ("Frupac"), will be denied.