THE PHILADELPHIA PARKING
AUTHORITY, Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
Defendant.

No. 03 Civ.6748 DAB.

United States District Court,
S.D. New York.

Jan. 14, 2005.

John N. Ellison, Anderson Kill & Olick, P.C., New York, NY, for Plaintiff.

Martin London, H. Christopher Boehning and Eric Alan Stone, Paul, Weiss, Rifkind, Wharton & Garrison, LLP, New York, NY, for Defendant.

## OPINION

BATTS, District Judge.

Plaintiff Philadelphia Parking Authority (the "Parking Authority"), as insured, brings this action against its insurer, Defendant Federal Insurance Company ("Federal"), for breach of contract and bad faith conduct in processing Plaintiff's claim arising under its Property Insurance Policy (the "Insurance Policy") for losses sustained from the Federal Aviation Administration's order grounding all civil aircraft after the terrorist attacks on September 11, 2001.

Defendant has moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons that follow, the Court GRANTS Defendant's Motion to Dismiss in its entirety.

## I. BACKGROUND

Plaintiff Parking Authority is a Pennsylvania state agency that operates parking garages at the Philadelphia International Airport.[1] (Compl. ¶¶ 3, 43.) Defendant Federal, a property and casualty insurance company owned by the Chubb Group, sold Plaintiff a Property Insurance Policy, ef-

---

1. Plaintiff cites 53 P.S. § 341 as the law under which the Pennsylvania legislature authorizes the creation of the Parking Authority. The Court notes that § 341 was repealed in 2001 and replaced by 55 P.S. § 5501 et seq.

fective March 31, 2001 through March 31, 2002, which covered various locations in Philadelphia including the airport parking facilities. (Id.¶¶ 4, 8–10.) The Complaint identifies three specific policy provisions under which Plaintiff seeks to recoup its business losses. (Id.¶¶ 12, 20, 24.) The first is the Business Income and Extra Expense Provision ("Business Income Provision"), which states:

> We will pay for the loss of Business Income and Extra Expense which you incur due to the actual interruption of your operations during the period of indemnity. This actual interruption of your operations must be caused by direct physical loss or damage caused by a covered cause of loss to: A. covered property. . . .

(Compl. at Ex. A (emphasis omitted).) The second is the Contingent Business Provision ("Contingent Business Provision"), which requires Defendant to

> pay for the loss of Business Income and Extra Expense which you incur due to the actual interruption of your operations during the period of indemnity as a result of direct physical loss or damage caused by a covered cause of loss to property not otherwise excluded at contingent business premises.

(Id. (emphasis omitted).) Finally, the third is the Civil Authority Provision (the "Civil Authority Provision"), providing coverage

> for the loss of Business Income and Extra Expenses which you incur due [to] the actual interruption of your operations during the period of indemnity when a civil authority prohibits access to your covered property because of direct physical loss or damage caused by a covered cause of loss to property not

otherwise excluded in the vicinity of your covered property.

(Id. (emphasis omitted).)

On September 11, 2001, terrorists hijacked four civil aircraft in the eastern United States. (Compl.¶ 26.) Hijackers flew one plane into Building One of the World Trade Center in New York City at 8:46 A.M. and a second plane into Building Two at 9:02 A.M. (Id.¶¶ 27–28.) At 9:06 A.M., the Federal Aviation Administration ("FAA") issued a "First Tier" groundstop, which "banned takeoffs of all flights bound to or through the airspace of New York Center" from airports throughout the northeastern United States. (Id.¶ 30.) This order, Plaintiff claims, effectively closed the Philadelphia International Airport, which is considered to be part of the New York Center. (Id.¶ 31.) The FAA then issued a national groundstop at 9:26 A.M., which grounded all flights regardless of destination. (Id.¶ 33.)

At 9:40 A.M., hijackers flew a third plane into the Pentagon building near Washington D.C.[2] (Id.¶ 34.) The FAA issued an order at 9:45 a.m. directing all civil aircraft then in flight to land as soon as possible. (Id.¶ 35.) The fourth plane crashed in Somerset County, Pennsylvania at 10:07 a.m. (Id.¶ 37.) The FAA reaffirmed its earlier order and issued a Notice to Airmen ("NOTAM") at 10:39 a.m. which halted takeoffs and landings at all airports in the United States. (Id.¶ 41.) The NOTAM stated:

> SPECIAL NOTICE—DUE TO EXTRAORDINARY CIRCUMSTANCES AND FOR REASONS OF SAFETY. ATTENTION ALL AIRCRAFT OPERATORS, BY ORDER OF THE FEDERAL AVATION [sic] COMMAND CENTER, ALL AIRPORTS/AIR-

---

2. The Complaint states that the third plane crashed into the Pentagon, located in Washington, D.C. (Compl.¶ 34.) The Court takes judicial notice, however, that the Pentagon is in fact located across the Potomac River in Arlington, Virginia.

DROMES ARE NOT AUTHORIZED FOR LANDING AND TAKEOFF. ALL TRAFFIC INCLUDING AIRBORNE AIRCRAFT ARE ENCOURAGE [sic] TO LAND SHORTLY.

(Pl.'s Mem. of Law at Ex. 2.) [3]

Since Plaintiff's garage is part of Philadelphia International Airport and Plaintiff depends on the airport to attract its customers, Plaintiff's business was interrupted as a result of the groundstop. (Id. ¶¶ 44, 48–49.) This interruption caused Plaintiff to lose income, for which Plaintiff submitted a claim under the Insurance Policy to Defendant on December 7, 2001. (Compl. ¶¶ 51–52.)

By letter dated March 11, 2002, Defendant identified the "relevant sources of coverage" as the Business Income, Contingent Business Premises, and Civil Authority Provisions of the Insurance Policy and denied coverage under all three provisions. (Compl. at Ex. C.) Defendant stated that it was denying coverage under the Business Income and Contingent Business Premises Provisions because no "direct physical loss or damage" had occurred "to the insured premises." (Id.) Defendant further determined that under the Civil Authority Provision Plaintiff "ha[d] not demonstrated that access to its covered property was prohibited by a civil authority," and that

it was not the direct physical loss or damage to the World Trade Center, Pentagon or the airplanes crashing into those structures that caused or resulted in interruption of The Philadelphia Parking Authority operations. Rather it was concern about future terrorist attacks that led to the shutdown of the air

transportation system, which does not satisfy this element of coverage.

(Id.)

Plaintiff wrote to Defendant again on April 11, 2002, restating its claim for coverage under the Policy and disputing Defendant's reasons for denial. (Compl. ¶ 55.) The Parking Authority further added that "as a direct result of the Federal Aviation Authority's ... ground stop order, the City of Philadelphia Department of Aviation (the 'City DOA'), a 'second civil authority,' prohibited access to [Plaintiff's] airport parking facilities." (Compl. at Ex. D.)

On April 30, 2002, Defendant's counsel, Cozen O'Conner ("Cozen"), notified Plaintiff by letter that it would analyze the Insurance Policy and advise Defendant on the matter. (Compl. ¶ 56.) By letter dated May 24, 2002, Cozen reiterated Defendant's denial of coverage. (Id. ¶ 57.) Cozen restated that Defendant was aware of "no physical loss or damage suffered at the Philadelphia Airport ... or to the parking facilities owned or operated by [Plaintiff]." (Compl. at Ex. F.) With regard to the Civil Authority provision, Cozen stated that, even assuming the City DOA order prohibited access to Plaintiff's covered property, "there is no direct nexus between physical loss or damage and the closure of the airport or the insured's parking facilities." (Id.) In addition to reiterating these two reasons (originally given by Defendant in its March 11, 2002 letter), Cozen further stated that the property damage caused by the plane crashes in New York, Washington D.C., and Western Pennsylvania "was not in the vicinity of" Plaintiff's covered property. (Id.)

---

**3.** While the text of the NOTAM was not included in the Complaint, Plaintiff agrees that it may be considered in deciding this motion since the NOTAM "was relied upon when drafting the Complaint and is an integral part of [Plaintiff's] claim." (Pl.'s Mem. of Law at 9, n. 4 (citing *Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)).)

On August 13, 2002, Plaintiff wrote Defendant asking "whether Federal formally adopt[ed] the position taken in the opinion letter [from Cozen], and whether Federal intend[ed] to further change its position about why it [was] denying coverage." (Compl. at Ex. G.) Cozen replied by letter dated September 19, 2002, affirming that the position stated in its May 24th letter was Defendant's response to Plaintiff's claim. (Id.¶ 62.)

Plaintiff also sent Defendant a letter on August 14, 2002 requesting access to all documents on which Defendant based its denial of coverage. (Id.¶ 60.) Defendant has not made its files available for Plaintiff's review. (Id.¶ 61.)

Plaintiff filed suit seeking declaratory judgment and damages for breach of contract and Defendant's alleged bad faith conduct. (Id.¶¶ 67–68, 70–72, 76–78.) Plaintiff claims damages of approximately $10.2 million. (Id.¶ 71.) Defendant has moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II. DISCUSSION

### A. Standard for Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim, the Court "must accept the allegations contained therein as true and draw all reasonable inferences therefrom in favor of the plaintiff." *Gryl ex rel. Shire Pharms. Group PLC v. Shire Pharms. Group PLC*, 298 F.3d 136, 140 (2d Cir.2002). The Court's task "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir.2000) (quoting *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 779 (2d Cir.1984) (internal quotations omitted)). Thus, the Court should dismiss the complaint for failure to state a claim only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also ICOM Holding, Inc. v. MCI Worldcom, Inc.*, 238 F.3d 219, 221 (2d Cir.2001).

■ As a threshold matter, Plaintiff claims that Defendant's submission of materials outside the Complaint should convert Defendant's motion to dismiss into one for summary judgment. (Pl.'s Mem. of Law at 7.) Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, where "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Specifically, Plaintiff identifies two documents attached to Defendant's Affidavit of H. Christopher Boehning: 1) excerpts from the Hearing of the National Commission On Terrorist Attacks Upon the United States, Day 2, Civil Aviation Security, which took place on May 23, 2003; and 2) *World Trade Center Shutdowns May Trigger Insurance Coverage*, a 2001 article by John N. Ellison and Claudine Q. Homolash.

The "mere attachment of affidavits or exhibits [however,] to a Defendant's papers is not sufficient to require conversion to a motion for summary judgment." *Salichs v. Tortorelli*, 01 CIV. 7288, 2004 WL 602784, at *1 (S.D.N.Y. Mar. 29, 2004) (citation omitted). Indeed, "reversal for lack of conversion is not required unless there is reason to believe that the extrinsic evidence actually affected the district court's decision and thus was not at least implicitly excluded." *Amaker v. Weiner*, 179 F.3d 48, 50 (2d Cir.1999).

Moreover, the Court is not prohibited from examining all extrinsic documents.

*See Chambers v. Time Warner,* 282 F.3d 147 (2d Cir.2002). Courts should look to "a plaintiff's reliance on the terms and effect of a document in drafting the complaint" as "a necessary prerequisite to the court's consideration of the document on a dismissal motion." *Id.* at 153. Where a plaintiff relies upon a document of undisputed authenticity, "a court may consider 'documents attached to the complaint as an exhibit or incorporated in it by reference . . ., matters of which judicial notice may be taken, or . . . documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Id.* (quoting *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993)). "To be incorporated by reference, the Complaint must make a clear, definite and substantial reference to the documents." *Thomas v. Westchester County Health Care Corp.,* 232 F.Supp.2d 273, 275 (S.D.N.Y.2002). Even where documents are not explicitly incorporated, a court may consider them if they are integral to the complaint. *Id.; Int'l Audiotext Network, Inc. v. American Tel. and Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (Court may consider commercial agreement not incorporated by reference because it is "integral" to complaint relying on its terms and effect); *Cortec Industries, Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991) (holding that a plaintiff may not avoid consideration of document integral to his complaint by failing to attach or incorporate it by reference and that a defendant may produce the document when moving to dismiss).

The Court decides this motion solely on the Complaint and without relying on the two extraneous materials presented by Defendant. The Court has, however, relied on several documents to which Plaintiff made reference in the Complaint and which Plaintiff attached to the Complaint as Exhibits A–I. Conversion to a motion for summary judgment is thus unnecessary.

**B. Choice of Law**

Federal courts sitting in diversity are required to apply the choice-of-law rules of the state in which they reside. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Maryland Cas. Co. v. Continental Cas. Co.,* 332 F.3d 145, 150–51 (2d Cir.2003) (affirming a district court's application of New York choice-of-law rules to an insurance dispute). This Court, therefore, applies New York choice-of-law rules.

"New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1030 (2d Cir.1996). New York employs "a 'center of gravity' or 'grouping of contacts' approach," under which "courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Id.* at 1030–31.

Not only do the parties agree that Pennsylvania substantive law applies to this case, (Pl.'s Mem. of Law at 7 n. 3, 29 n. 14; Def.'s Mem. of Law at 9 n. 4), but it is clear to the Court that Pennsylvania has the "most significant interest in, or relationship to, the dispute." Indeed, Plaintiff, a Pennsylvania agency, initiated the purchase of the Insurance Policy from its offices in Pennsylvania. (Pl.'s Mem. of Law at 7 n. 3.) Plaintiff's insurance broker, with whom Plaintiff negotiated the Policy, is located in Pennsylvania, and the subject matter of the Policy, Plaintiff's garages, is also in Pennsylvania. (Id.) Therefore, Pennsylvania law applies.

## C. Declaratory Judgment and Breach of Contract Claims

Under Pennsylvania law, the construction of an insurance contract is a question of law; in interpreting its terms, courts should "examine the contract in its entirety, giving all of the provisions their proper effect." *Burton v. Republic Ins. Co.*, 845 A.2d 889, 893 (Pa.Super.2004) (citing *Riccio v. American Republic Ins. Co.*, 550 Pa. 254, 705 A.2d 422 (1997) (citation omitted)). The goal is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Neuhard v. Travelers Ins. Co.*, 831 A.2d 602, 604 (Pa.Super.2003) (quoting *Madison Construction Co. v. The Harleysville Mutual Ins. Co.*, 557 Pa. 595, 735 A.2d 100, 106 (1999)).

■ Each word in the insurance contract must be construed in its "natural, plain, and ordinary sense." *Riccio*, 705 A.2d at 426. When the language in the policy "is clear and unambiguous, the court must give effect to the language of the contract." *Id.* (citing *Bateman v. Motorists Mutual Ins. Co.*, 527 Pa. 241, 245, 590 A.2d 281, 283 (1991)). If the provision at issue, however, is ambiguous, then that "provision must be construed in favor of the insured against the insurer as drafter of the instrument." *Id.*

■ This determination is a question for the court, *DiFabio v. Centaur Ins. Co.*, 366 Pa.Super. 590, 531 A.2d 1141, 1143 (Pa.Super.1987) (citations omitted), and contractual language is ambiguous only "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison*, 735 A.2d at 106 (citation omitted). This analysis is furthermore

> not ... to be resolved in a vacuum. Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts. We will not,

however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity. The polestar of our inquiry, therefore, is the language of the insurance policy.

*Id.* (internal citations omitted). Finally, "an ambiguity does not exist simply because the parties disagree on the proper construction to be given a particular policy provision" since courts "should read policy provisions to avoid an ambiguity if possible." *Neuhard*, 831 A.2d at 605 (citation omitted).

### 1. Business Income and Contingent Business Provisions

■ Plaintiff claims the phrase "direct physical loss or damage" is ambiguous because it is unclear whether "direct physical" modifies "damage" as well as "loss." (Pl.'s Mem. of Law at 21–22.) Therefore, Plaintiff argues, the Court should construe the phrase in Plaintiff's favor and read the word "damage" to include economic damage. (Id.) The Parking Authority should accordingly recover under the Policy's Business Income and Contingent Business Provisions.

Defendant argues "direct physical" modifies both "loss" and "damage," and thus, purely economic damage is not covered under the Insurance Policy. (Def.'s Mem. of Law at 10.) Defendant cites numerous cases from other jurisdictions in support of its position, though none apply Pennsylvania law or were decided by that state's courts. (Id.) Defendant further argues that, when read as a whole, the phrase is not ambiguous and that "[o]nly by 'torturing' the phrase ... may Plaintiff argue that damage need not be physical." (Id.) Thus, because Plaintiff has not alleged any physical damage to its insured property, recovery under any of the Policy's provisions would be precluded.

It is clear to the Court that the Business Income Provision requires four elements be established to invoke coverage: 1) the loss must be "due to the actual interruption of ... operations during the period of indemnity"; 2) the "actual interruption ... must be caused by direct physical loss or damage"; 3) the "direct physical loss or damage" must be "caused by a covered cause of loss"; and 4) the "direct physical loss or damage" must have occurred to insured property. (Compl. at Ex. A.) In other words, a "covered cause of loss" must result in some "direct physical loss or damage," which in turn must interrupt the insured's business operations.

Nowhere in the Complaint does Plaintiff allege that the economic damage for which it seeks recovery actually caused the interruption of the Parking Authority's business. Instead, it appears the interruption of Plaintiff's business caused Plaintiff's economic damage. Indeed, Plaintiff states as much in the Complaint: "In particular, [Plaintiff] suffered losses of income ... as a *result* of the business interruption, during the period of indemnity as enumerated under the Policy." (Compl. ¶ 51 (emphasis added).) This clearly does not fit the plain language of the Business Income Provision. Even assuming, *arguendo,* that "direct physical loss or damage" could be construed to include purely economic damage, Plaintiff has failed to state a claim for coverage under this Provision of its Policy.

The same reasoning applies to the Contingent Business Premises Provision. Here too, the Provision requires that the interruption of operations take place "as a result of direct physical loss or damage." (Compl. at Ex. A.) Since Plaintiff makes no allegation in its Complaint that the interruption of its business resulted from its economic damage, Plaintiff fails to state a claim under the Contingent Business Premises Provision.

It is clear to the Court, moreover, that Plaintiff's claims under both these Provisions fail because "direct physical loss or damage" is unambiguous when read in the broader context of the Policy. Indeed, the Policy specifically excludes "any increase in loss caused by or resulting from ... interference at the location(s) by strikers or other persons causing a delay in rebuilding, repairing or replacing the covered property or resuming operations." (Id. (emphasis omitted).) "Rebuild," "repair" and "replace" all strongly suggest that the damage contemplated by the Policy is physical in nature. Similarly, these words are again used in the Policy's "period of indemnity," which "begin[s] on the date of direct physical loss or damage ... and continue[s] thereafter until such time as the covered property could have been repaired, replaced or restored...." (Id. (emphasis omitted).) Even if the Court construed this period to begin on the first date that the insured experienced economic damage, the Policy would provide no logical termination of the indemnity period since there would be no lost or damaged "covered property" to "repair[ ], replace[ ], or restore[ ]."

Furthermore, if Plaintiff's proffered interpretation of the language were correct, the Provisions' requirements would be unreasonable as applied to a business interruption claim based on purely economic damage. As discussed above, an insured making such a claim would need to show not only that the economic damage (to either the insured's covered property or a contingent business premises) resulted from a "covered cause of loss," but also that the economic damage itself caused the interruption in the insured's business operations. It is difficult to imagine such a situation actually taking place. Moreover, it was clearly not the situation here.

However, if, as Defendant argues, "direct physical" modifies both loss and damage, the Provisions' requirements make sense: the interruption in business must be caused by some physical problem with the covered property (or the contingent business premises), which must be caused by a "covered cause of loss." For example, if an insured business had to temporarily close its store because of structural damage caused by a fire, the Business Income and Extra Expense Provision would clearly cover the resulting losses. In that instance, the "direct physical loss or damage" would be the structural damage, and the "covered cause of loss" would be the fire. Thus, the Court will not adopt Plaintiff's "torturing the phrase" merely to create an ambiguity which does not exist when the contractual text is read in context and its words construed in their commonplace meanings.

Finally, Plaintiff's citations to case law to support its argument that this Court should find the phrase "direct physical loss or damage" ambiguous are wholly inapposite. (Pl.'s Mem. of Law at 22–24.) In *Dri–Kleen, Inc. v. Western National Mutual Insurance Group,* an unpublished decision,[4] No. C2–01–2105, 2002 WL 1611507, at *5–6 (Minn.App. July 23, 2002), the Minnesota Court of Appeals interpreted an insurance provision prohibiting suit more than "2 years after the date on which the direct physical loss or damage occurred." The court there found it was unclear whether "direct physical" modified both "loss" and "damage." *Id.*

Whether or not the Minnesota court's reasoning is sound on the facts of that case, it does not apply here. The *Dri–*

*Kleen* court found the phrase ambiguous only because the language did not clearly communicate the date on which the period of limitations began to run; the court did not find ambiguity as to what types of loss or damage the policy covered. Furthermore, as Defendant aptly observes, the Minnesota Court of Appeals has in another case, this one published, *Thane Hawkins Polar Chevrolet, Inc. v. Truck Ins. Exch.,* No. C6–94–2068, 1995 WL 70152, at *2 (Minn.App. Feb.21, 1995), held that "the phrase 'physical loss or damage' is susceptible to only one ordinary and natural meaning which does not encompass a claim" for economic damage.

Plaintiff's reference to a Massachusetts case, *Matzner v. Seaco Insurance Company,* No. CIV.A.96–0498–B, 1998 WL 566658 (Mass.Super.Aug. 12, 1998), also does not help its position. In that case, the Superior Court of Massachusetts held that it was unclear whether the phrase "direct physical loss or damage" meant "only tangible damage to the structure of insured property" or "a wider array of losses." The court adopted a broader interpretation of the phrase which included carbon monoxide contamination of property that was arguably not "physical." *Id.* at *3. Several of the cases cited in *Matzner* apply a similarly expansive interpretation of the word "physical" to allow recovery for damage resulting from contamination of the covered premises. *See, e.g., W. Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 437 P.2d 52 (Colo.1968) (gasoline contamination); *Sentinel Mgt. Co. v. N.H. Ins. Co.,* 563 N.W.2d 296 (Minn.Ct.App. 1997) (asbestos contamination).

---

4. Not only is the holding of this Minnesota inapposite here as the Court discusses in the ensuing analysis, but unpublished decisions in Minnesota hold no precedential value. Minn. Stat. § 408A.08 Subd. 3 (2003). ("Unpublished decisions of the court of appeals are not precedential."). Even the state's Supreme Court has declared that "we pause to stress that unpublished opinions of the court of appeals are not precedential ... [because] [t]he danger of miscitation is great." *Vlahos v. R & I Const. of Bloomington, Inc.,* 676 N.W.2d 672, 676 n. 3 (Minn.2004) (internal citation omitted).

The Court agrees with Defendant that the Massachusetts case may be bad law as it does not refer to or acknowledge a Massachusetts Court of Appeals case that held that "in the absence of physical damage" there is no coverage under the phrase "physical loss or damage." *HRG Dev. Corp. v. Graphic Arts Mut. Ins. Co.,* 26 Mass.App.Ct. 374, 527 N.E.2d 1179, 1180 (1988) (emphasis omitted). However, even if *Matzner* is considered good law, the "arguably physical" damage of carbon monoxide contamination at issue in *Matzner* is very different from the purely economic damages for which Plaintiff seeks recovery.

The Court finds that the phrase "physical loss or damage" is not ambiguous since "reasonably intelligent [people] on considering it in the context of the entire policy would [not] honestly differ as to its meaning." *United Servs. Auto Ass'n v. Elitzky,* 358 Pa.Super. 362, 517 A.2d 982, 985 (1986) (internal citation omitted). As stated above, the phrase "direct physical loss or damage," when considered in the context of the Insurance Policy at issue in the present case, requires that claimed loss or damage must be physical in nature.

## 2. Civil Authority Provision

■ Plaintiff claims coverage under the Civil Authority Provision because a civil authority, the Federal Aviation Administration, issued an order, the NOTAM of September 11, 2001 (reprinted above), which Plaintiff alleges "effectively prevented ingress and egress of passengers into terminal areas of the Philadelphia International Airport and [Plaintiff's] Airport Parking Facilities." (Compl.¶¶ 41, 49.) Plaintiff claims that "subsequent to and as a direct consequence of the closure of the Airport and Airport Parking facilities, there was a severe reduction in [Plaintiff's] business." (Id.¶ 50.)

Defendant asserts that Plaintiff' claim is not covered because Plaintiff failed to plead three elements necessary to invoke the policy's Civil Authority coverage: 1) that the NOTAM "prohibit[ed] access to" Plaintiff's garages; 2) that the NOTAM was ordered "because of direct physical loss or damage"; and 3) that such loss or damage occurred to property "in the vicinity of" Plaintiff's garages. (Def.'s Mem. of Law at 13.)

The plain language of the NOTAM shows it did not "prohibit[ ] access to" Plaintiff's garages as the policy requires. The NOTAM was issued to the attention of "all aircraft operators," and deals only with the grounding of airplanes. While this unprecedented order may have temporarily obviated the need for Plaintiff's parking services, it did not prohibit access to Plaintiff's garages and therefore cannot be used to invoke coverage under Plaintiff's policy.

Since the FAA's NOTAM did not prohibit access to Plaintiff's garages, it is unnecessary for the Court to decide whether the FAA issued the NOTAM "because of" the damage caused by the plane crashes in New York, Washington D.C., and Pennsylvania or, as Defendant argues, only to prevent additional terrorist attacks.

While Rule 15(a) of the Federal Rules of Civil Procedure requires that courts freely grant leave to amend "when justice so requires," courts deny such leave where amendment would be futile. *See Oneida Indian Nation of N.Y. v. City of Sherrill,* 337 F.3d 139, 168 (2d Cir.2003) (citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Id.* (citing *Ricciuti v. N.Y.C. Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991)). Since Plaintiff has not, and cannot, allege any

physical damage to its garages or the Philadelphia International Airport, or that any civil authority acted in a manner to invoke the Civil Authority Provision, leave to amend would be futile. The Court therefore denies Plaintiff leave to amend the Complaint with respect to the Business Income and Extra Expense, Contingent Business Premises and the Civil Authority Provisions.

### D. Bad Faith Claim

■ Lastly, Plaintiff claims that Defendant processed and denied Plaintiff's request for coverage in bad faith. (Compl.¶ 77.) Bad faith conduct by an insurer is actionable pursuant to Title 42, § 8371 of Pennsylvania Consolidated Statutes Annotated, which provides:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions: (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%. (2) Award punitive damages against the insurer. (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons.Stat. Ann. § 8371 (2004). "Though left undefined by the statute, 'bad faith toward the insured' consists of: (1) a frivolous or unfounded refusal to pay, (2) a failure to investigate into the facts, or (3) a failure to communicate with the insured." *Livornese v. Med. Protective Co.*, 219 F.Supp.2d 645, 647 (E.D.Pa.2002) (citing *Frog, Switch Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n. 9 (3d Cir. 1999).) Plaintiff alleges all three categories of bad faith conduct. (Compl.¶ 77.)

With regard to the first category, "frivolous or unfounded refusal to pay," Plaintiff alleges that Defendant denied coverage to coerce litigation, gave meritless reasons for denial, wrongfully interpreted the policy in its own favor, wrongfully deprived Plaintiff of benefits, and used funds that should have been paid to Plaintiff. (Compl.¶ 77.)

"To establish liability for bad faith refusal to pay, an insured must demonstrate both of the following: (1) the insurer lacked a reasonable basis for denying benefits, and (2) the insurer knew or recklessly disregarded its lack of such reasonable basis." *Livornese*, 219 F.Supp.2d at 647 (citing *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir.1997)). With regard to the first prong, the court explained that "a court need consider only whether any reasonable basis existed for the insurer's conduct and not whether the insurance company itself relied on a reasonable foundation." *Id.* at 648. "As a matter of law, if some reasonable basis did exist, that insurer cannot have acted in bad faith, under Section 8371." *Id.* The Court finds that Defendant was reasonable in denying coverage of Plaintiff's claim; thus, Plaintiff has not met the elements of a claim of bad faith refusal to pay.

■ Under the second category of bad faith conduct listed above, Plaintiff alleges that Defendant failed to investigate adequately Plaintiff's claim before denying coverage. (Compl.¶ 77.)

Defendant denied coverage because the facts as stated by the Plaintiff simply did not invoke coverage under the plain language of the policy. (Compl. at Ex. C.) Defendant did not question any facts asserted by Plaintiff, but rather accepted Plaintiff's claims as true for the purpose of analyzing coverage. (Id.) In addition, Defendant in its letter denying coverage, informed Plaintiff: "if you believe we have overlooked any pertinent facts, or if there is any additional information you wish us to consider in connection with this claim,

we ask that you kindly bring it to our attention as soon as possible." (Id.)

Since Defendant accepted all of Plaintiff's claims as true and correctly denied coverage based on the language of the policy, investigation into the facts was unnecessary. It is unclear what Plaintiff believes Defendant should have investigated before denying Plaintiff's claim. Unless Plaintiff omitted from its initial request information that would have brought its claims within the policy's coverage (in which case Plaintiff should have included such information in Plaintiff's request for reconsideration), no investigation would have changed the fact that Plaintiff's property insurance policy did not cover the losses Plaintiff sustained on September 11, 2001. Thus, Defendant's failure to investigate Plaintiff's claim before denying coverage was not in bad faith.

Under the third category of bad faith conduct, failure to communicate with the insured, Plaintiff claims that Defendant failed to advise Plaintiff of its rights under the policy. (Compl.¶ 77.) However, Defendant promptly responded to Plaintiff's request for coverage with a letter analyzing the policy language and detailing Defendant's reasons for denying coverage. (Compl. at Ex. C.) Defendant also made clear that Plaintiff should notify Defendant if other facts exist which would make the claim fall within the policy's parameters. (Id.) Thus Defendant clearly advised Plaintiff of its rights under the policy.

Plaintiff also alleges generally that Defendant failed to treat Plaintiff openly and honestly, misrepresented the terms of policy coverage, placed its own interests above the insured's, employed an attorney to perform a claim analysis in order to obviate Defendant's responsibility under the policy and prevent discovery, and "engag[ed] in such other acts and omissions violative of Federal's duty of good faith and fair dealing." (Compl.¶ 77.)

Plaintiff included in its Complaint that Defendant changed its reasons for denying coverage. (Compl.¶ 59.) Plaintiff claims that the common law "mend the hold" doctrine prevents Defendant from altering its reasons for denying coverage from those stated in its initial denial. (Pl.'s Mem. Law at 32–35.)

Defendant's letters to Plaintiff denying coverage (attached to Plaintiff's Complaint as Exhibits C and F) reveal that Defendant did not change its reasons, but merely added an additional reason, for denying coverage. Defendant's letter of March 11, 2002 denied coverage under the Business Income and Contingent Business provisions because the covered properties sustained no "direct physical" damage, and under the Civil Authority provision because no civil authority prohibited access to Plaintiff's property and Defendant asserted that the NOTAM was not issued "because of" the loss or damage. (Compl. at Ex. C.) In its May 24, 2002 letter to Plaintiff, Defendant's counsel reiterated these same reasons and added that the damage caused by the plane crashes was not "in the vicinity of" Plaintiff's garages. (Compl. at Ex. F.)

The "mend the hold" doctrine does not save Plaintiff's bad faith claim. In *Motorists Mutual Insurance Company v. Hardinger*, the plaintiff sought to apply the "mend the hold" doctrine to prevent its insurer from raising defenses not asserted in its initial denial. No. CIV.A.02–8310, 2004 WL 384999, at *4 (E.D.Pa. Feb.27, 2004). The Eastern District of Pennsylvania held that the "mend the hold" doctrine did not apply. *Id.* Even if the doctrine did apply, the court stated, the insurer would not be precluded from raising its additional defense because it expressly reserved the right to do so.

Defendant, in its initial denial letter of March 11, expressly stated that

292

neither this letter nor any conduct related to this matter shall be construed as a waiver of, nor shall Federal Insurance Company be estopped from asserting in the future, and rights or defenses it may have under its policy, regulation or law, and all such rights and defenses are hereby expressly reserved.

(Compl. at Ex. C.) Thus, Defendant did not act in bad faith by adding an additional ground for denial to its May 24 letter.

Since Plaintiff has not, and cannot, allege any bad faith by Defendant, leave to amend the bad faith claim would be futile. The Court therefore denies Plaintiff leave to amend the Complaint with regard to the bad faith claim.

### III. CONCLUSION

Accordingly, Defendant's Motion to Dismiss the Complaint is GRANTED.