**UNITED AIRLINES, INC., Plaintiff,**

v.

**INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, Defendant.**

**No. 03 Civ. 5189(RMB).**

United States District Court, S.D. New York.

April 1, 2005.

**344**

Geoffrey J. Greeves, Greenberg Traurig, L.L.P., Washington, DC, John Francis Triggs, III, Greenberg Traurig, LLP, New York, NY, Peter M. Gillon, Ronald W. Kleinman, Greenberg, Traurig, L.L.P., Washington, DC, for plaintiff.

Eugene Wollan, Jeffrey Steven Weinstein, Mound, Cotton, Wollan & Greengrass, New York, NY, for defendant.

## *DECISION AND ORDER*

BERMAN, District Judge.

### I. Introduction

On July 11, 2003, United Air Lines, Inc. ("Plaintiff" or "UAL") filed a complaint ("Complaint") against the Insurance Company of the State of Pennsylvania ("Defendant" or "ISOP") alleging that UAL is entitled to business interruption insurance coverage for its system-wide loss of revenue resulting from the September 11, 2001 terrorist attacks at the World Trade Center ("WTC") and the Pentagon, including losses related to "the total shutdown of the United States aviation system by the Federal Aviation Administration (the 'FAA') and related charges resulting in a loss of income to UAL approaching $1.2 billion." (Complaint ¶ 3.) An amended complaint was filed on November 21, 2003 ("Amended Complaint" or "Am. Compl.") seeking a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and damages for breach of contract "in an amount not less than $25 million." (Am. Compl. at 7–9.)[1] On December 8, 2003, ISOP answered the

---

1. The insurance policy at issue, "Property Terrorism & Sabotage Insurance," attached as Exhibit A to the Affidavit of Jeffrey S. Weinstein dated July 9, 2004 ("Weinstein Aff.") (hereinafter the "Policy"), limits liability to a total of $25 million for each policy year. (Policy at 00001.)

Amended Complaint and submitted seven counterclaims, seeking declaratory judgment that ISOP is not obligated to UAL on the claims alleged in the Amended Complaint. (Answer, Amended Affirmative Defenses, and Amended Counterclaims dated Dec. 8, 2003 ("Answer and Counterclaims").)

On June 1, 2004, UAL moved for summary judgment ("UAL Motion") pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 56 as to all claims in the Amended Complaint and counterclaims one through five filed by ISOP. (UAL Motion at 1.) On July 9, 2004, ISOP opposed UAL's Motion and cross-moved for summary judgment on all claims, including counterclaims six and seven ("ISOP Opp'n").[2] UAL filed Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment on July 26, 2004 ("UAL Reply"), and ISOP filed its Reply Memorandum of Law in Further Support of its Cross–Motion for Summary Judgment on August 9, 2004 ("ISOP Sur–Reply"). By letter to the Court dated March 4, 2005, the parties waived oral argument. **For the reasons below, UAL's motion for summary judgment is denied and ISOP's cross-motion for summary judgment is granted.**

## II. Background

UAL is a commercial airline and Delaware corporation with its principal place of business in Illinois. (Pl. Statement of Undisputed Facts Pursuant to Local Rule 56.1 dated June 1, 2004 ("UAL 56.1 Stmt.") ¶ 1.) ISOP is a Pennsylvania corporation licensed to conduct the business of insur-

ance in the State of New York. (ISOP Response to UAL's Statement of Undisputed Material Facts Pursuant to Local Civil Rule 56.1(b) dated July 9, 2004 ("ISOP 56.1 Resp.") ¶ 2.)

UAL and ISOP entered into the Policy for the period of May 3, 2001 to May 3, 2002. (ISOP 56.1 Resp. ¶ 4; Policy at 00009.) UAL paid all required premiums and the Policy was in full force and effect from May 3, 2001 until May 3, 2002. (ISOP 56.1 Resp. ¶¶ 8–9.) The Policy is governed by New York law, *id.* ¶ 13, and states, in relevant part:

- "I. Insuring Agreement

   A. The Company will indemnify the insured for property damage, loss of gross earnings, and extra expense . . . resulting from the following incidents, and any ensuing fire damage, damage from looting, or other damage caused by an act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of any of the following incidents . . .

   1. Terrorism . . .

- III. Valuation

   C. Business Interruption

   1. Gross Earnings. This policy insures against loss resulting directly from the necessary interruption of business caused by damage to or destruction of the Insured Locations, resulting from Terrorism . . .

This section is specifically extended to cover a situation when access to the Insured Locations is prohibited by order of civil authority as a direct result of damage to adjacent premises, not exceeding, however, two (2) consecutive weeks.

---

**2.** Counterclaims six and seven pertain to UAL's claim for loss of access to airline gates (beyond security checkpoints) at Ronald Reagan Washington National Airport ("Reagan Airport") "by order of civil authority as a

direct result of damage" to the Pentagon (the "Civil Authority claim"), discussed *infra* Part IV(C). (*See* Answer and Counterclaims ¶¶ 42–58; Policy at 00011; First Set of Stipulations dated Apr. 12, 2004 ("Stipulations") ¶¶ 2–3.)

In the event of loss, the Company will be liable ... for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the Insured Location(s) as has been damaged or destroyed ..."[3]

(Policy at 00009–11, 00013.) Endorsement # 2 of the Policy, dated June 16, 2000 ("Endorsement 2"), states, in relevant part:

- "It is hereby noted and agreed that Insured's properties located in U.K. territories are completely excluded from physical damages coverage ... the Business Interruption coverages ... will remain valid for Insured's properties in the U.K. territories."

(Endorsement 2, Policy at 00003.)

As is well known, between approximately 8:46 a.m. and 10:10 a.m. on September 11, 2001, four hijacked aircraft crashed into both towers of the World Trade Center, the Pentagon, and a field in Pennsylvania. (Plaintiff's Response to Defendant's Statement of Undisputed Material Facts dated July 26, 2004 ("UAL 56.1 Resp.") ¶¶ 3–4, 8–9.) At approximately 10:15 a.m., the Metropolitan Washington Airports Authority ("MWAA") made the decision to close Reagan Airport. (ISOP's Response to UAL's Statement of Material Facts Related to Reagan Airport Claim dated Aug. 9, 2004 ("ISOP Reagan Airport 56.1 Resp.") ¶ 4.) At approximately 10:39 a.m., the FAA issued a Notice to Airmen closing all operations at all airports nationwide. (UAL 56.1 Resp. ¶ 10.) The FAA's order "was an act of a lawfully constituted authority." (ISOP 56.1 Resp. ¶ 32.) Although the FAA "ground stop" order was lifted nationwide on September 14, 2001, Reagan Airport remained closed until October 4, 2001. (ISOP 56.1 Resp. ¶ 34; Stipulations ¶¶ 2–3.)

UAL's ticket counter in the WTC was destroyed on September 11, 2001. (ISOP 56.1 Resp. ¶ 37.) UAL also claims that its "gate property at Washington Reagan National Airport was physically impacted by the terrorist attack at the Pentagon, resulting in the accumulation of ash at the United gates." (UAL 56.1 Stmt. ¶ 38.) ISOP "denies that UAL's 'gate property' at Washington Reagan National Airport was physically impacted by the terrorist attack at the Pentagon." (ISOP 56.1 Resp. ¶ 38.)

On July 9, 2003, UAL submitted to ISOP a "sworn proof of loss" stating, among other things, "September 11–related losses through December 31, 2001 totaled approximately $1.2 billion." (ISOP 56.1 Resp. ¶ 54; "Statement of Loss" dated July 9, 2003, Ex. 34 to Decl. of Geoffrey J. Greeves dated May 28, 2004 ("Greeves 5/28/04 Decl.") ("Statement of Loss").)[4] UAL's damages expert, Daniel M. Kasper, estimated "net losses sustained by United as a result of the FAA mandated shutdown of the national aviation system" from September 11–14, 2001 to be $98,247,387.00. (Affidavit of Daniel M. Kasper dated May 24, 2004 ("Kasper Aff.") ¶¶ 33–34; *see also* UAL Reply at 8 ("quadruple the policy

---

3. The "Insured Locations" include "more than 110 domestic airports and other facilities at which UAL owns or leases property or otherwise has an insurable interest ..." (UAL 56.1 Resp. ¶ 14.)

4. As of August 2002, UAL had received $782 million from the federal government under the Air Transportation Safety and System Stabilization Act of 2001 ("Stabilization Act") for "direct losses incurred beginning on September 11, 2001, by air carriers as a result of any Federal ground stop order issued by the Secretary of Transportation ..." Air Transportation Safety and System Stabilization Act, 49 U.S.C. § 40101 (2004); ISOP 56.1 Resp. ¶¶ 51–52. Thus, "the total value of its unreimbursed losses [is] approximately $0.4 billion." (Statement of Loss ¶ 4.)

limits").) UAL claims that it "sustained a loss of gross earnings at [Reagan Airport] of approximately $4.7 million for the two week period commencing on September 11, 2001." (Supplemental Declaration of Frances DeBlasio dated Nov. 20, 2003 ¶ 4.) On September 25, 2003, ISOP issued a letter to UAL disputing "UAL's interpretation of the Policy insofar as UAL claimed that it was entitled to reimbursement for loss not directly related to the destruction of the ticket kiosk in the World Trade Center." (ISOP 56.1 Resp. ¶ 55.)

## III. Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material issue of fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82 (2d Cir.2004). "[A] district judge must view the evidence in the light most favorable to the non-moving party and must draw all inferences in favor of that party." *K. Bell & Assocs., Inc. v. Lloyd's Underwriters,* 97 F.3d 632, 636–37 (2d Cir.1996).

When cross-motions for summary judgment are made, the standard is the same as that for individual motions. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir.2001); *Elite Brands, Inc. v. Pa. Gen. Ins.,* No. 02 Civ. 5623, 2004 WL 1945732, at *3 (S.D.N.Y. Sept.2, 2004). The court must consider each motion independently of the other. *Morales,* 249 F.3d at 121.

"Under New York law, the court determines the proper construction of an insur-ance contract, as with other contracts, as a matter of law." *Elite Brands,* 2004 WL 1945732, at *3.[5] Whether ambiguity exists in a contract is a threshold question of law to be resolved by the Court. *See, e.g., Compagnie Financiere De Cic Et De L'UNION Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 232 F.3d 153, 158 (2d Cir.2000). A contract is ambiguous when its terms are "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992) (citation omitted). Conversely, contract language is unambiguous, and summary judgment may be granted, when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference in opinion.' " *Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan,* 7 F.3d 1091, 1095 (2d Cir.1993) (quoting *Breed v. Ins. Co. of N. Am.,* 46 N.Y.2d 351, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978)). When the language of a contract is plain, it "is not made ambiguous simply because the parties urge different interpretations." *Seiden Assocs.,* 959 F.2d at 428. If the contract is unambiguous, the Court is "required to give effect to the contract as written." *K. Bell & Assocs.,* 97 F.3d at 637.

## IV. Analysis

"While the parties appear to be in general agreement on the facts of the 9/11

---

**5.** "The parties agree that New York law governs this diversity case; their 'consent concludes the choice of law inquiry.' " *British*

*Int'l Ins. Co. v. Seguros La Republica, S.A.,* 342 F.3d 78, 81 (2d Cir.2003); *see also* UAL Motion at 8 n. 5; ISOP 56.1 Resp. ¶ 13.

Events, they disagree on the manner in which these Policy terms and conditions apply in the context of those events." (UAL Motion at 1.) The primary issues in dispute are: (A) whether "physical damage" is a prerequisite for business interruption coverage under the Policy, UAL Motion at 10–19; ISOP Opp'n at 2–10; (B) whether (i) destruction of UAL's ticket counter at the WTC and/or (ii) an "accumulation of ash" at UAL's Reagan Airport gates entitle UAL to system-wide business interruption coverage, UAL Motion at 19–20; ISOP Opp'n at 11–12; and (C) whether the Pentagon is an "adjacent premises" to Reagan Airport under the Civil Authority provision of the Policy, ISOP Opp'n at 18–23; UAL Reply at 5–8. Each issue is addressed below.

### (A) Physical Damage

■ UAL argues that "nothing in the Insuring Agreement expressly requires 'physical damage' at insured locations to trigger [business interruption] coverage." (UAL Motion at 10.) "[T]he Insuring Agreement uses only the unqualified word 'damage'—without any adjective—and no relevant exclusion limits the coverage for 'damage' under the Policy." (*Id.*) UAL further argues that "[c]learly ISOP knew how to insert the word 'physical' before the word 'damages', as found in Endorsement 2 to the Policy, and the absence of that modifier in the Insuring Agreement or the Valuation clause is dispositive of this case." (UAL Reply at 1.)

ISOP responds that "[t]he plain and ordinary meaning of the word 'damage' conveys physical damage and, despite UAL's contention, the word 'physical' need not precede the word damage to convey that meaning." (ISOP Opp'n at 3.) "UAL's professed inability to conduct business operations because of the grounding of aircraft and/or the denial of access to its airport gates as 'physically barred' and/or 'physically closed' does not equate to UAL

having suffered 'damage.'" (ISOP Sur-Reply at 2.) Furthermore, "the Policy has an extension of coverage (the 'Civil Authority' clause) that expressly provides Gross Earnings coverage (under certain circumstances) when the insured experiences a prohibition of access to its Insured Locations in the absence of damage to those locations. If a mere prohibition of access constituted 'damage,' this extension of coverage would be superfluous." (*Id.* at 2–3.)

The language of the Policy is clear, unambiguous and reasonably susceptible of only one interpretation with respect to the physical damage issue. *See* 11 Samuel Williston, *Williston on Contracts* § 32.2 (4th ed. 1999) ("The parties' language will be deemed conclusively indicative of their intentions where it is reasonably susceptible to only one interpretation."); *Navigators Ins. Co. v. Am. Home Assurance Co.*, No. 97 Civ. 2650, 1999 WL 681161, at *6 (S.D.N.Y. Sept. 1, 1999) ("If the agreement sets forth the parties' intent clearly and unambiguously, the Court need look no further ... and the agreement is to be enforced as written."). Physical damage must be shown for the following reasons:

Particular words or phrases from the "Insuring Agreement" clause of the Policy cannot, as UAL urges, be read in isolation from other Policy provisions, such as, for example, the "Valuation" clause which provides that loss of gross earnings means "loss resulting directly from the necessary interruption of business caused by **damage to or destruction of the Insured Locations** ..." (Policy at 00011 (emphasis added).) And, under the Civil Authority clause, coverage is "specifically extended" to "a situation when access to the Insured Locations is prohibited by order of civil authority as a direct result of damage to adjacent premises, not exceeding, however, two (2) consecutive weeks." (*Id.*)

UAL's argument that the word "damage" was intended to include economic as well as physical damage to the Insured Locations would appear to render the Civil Authority clause of the Policy inexplicable. That is, if, as UAL urges, it were able to recover for business interruption losses in the absence of any physical damage to an Insured Location, there would be no need to "specifically extend" coverage to cases involving "damage to adjacent premises." *See Sayers*, 7 F.3d at 1095 (citing *Two Guys from Harrison–N.Y., Inc. v. S.F.R. Realty Assocs.*, 63 N.Y.2d 396, 482 N.Y.S.2d 465, 472 N.E.2d 315 (1984)); *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir.2000) ("In a situation of potential contract ambiguity, an interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable."); *Williston on Contracts* § 32.5 (4th ed.1999).[6]

Other clauses of the Policy support the requirement of physical damage. For example, the Policy states in the "Gross Earnings" clause that, "In the event of loss, the Company will be liable for the reduction in gross earnings ... for only such length of time [needed] to rebuild, repair or replace such part of the Insured Location(s) as has been damaged or destroyed ..." (Policy at 00011.) And, under the "Notice of Incident" clause, "the Insured must notify the Company within 180 days after an incident of the Insured's intent to either repair or replace Buildings or Contents." Policy at 00012; *see Philadelphia Parking Auth. v. Fed. Ins. Co.*,

385 F.Supp.2d 280, 287, 2005 WL 78783, at *7 (S.D.N.Y. Jan. 14, 2005) ("'Rebuild,' 'repair' and 'replace' all strongly suggest that the damage contemplated by the Policy is physical in nature."). Similarly, in the "Definitions" section of the Policy, "Insured Locations" is defined as "only those Buildings or Contents which are listed in Item 7 of the declaration." (Policy at 00010.) Under the "Debris Removal" clause, "expenses necessarily incurred in the removal of all debris on the Insured property" are covered. (*Id.* at 00013.) Under the "Recovery and Salvage" clause, "[r]ecovery and salvage ... will be payable first to the Company ..." (*Id.*)

The inclusion of the modifier "physical" before "damages" in Endorsement 2 to the Policy also supports ISOP's position that physical damage is required before business interruption coverage is paid. Policy at 00003 ("Insured's properties located in U.K. territories are completely excluded from physical damages coverage provided under the above mentioned policy" but "Business Interruption coverages ... will remain valid for Insured's properties in the U.K."); *see also Roundabout Theatre Co. v. Cont'l Cas. Co.*, 302 A.D.2d 1, 751 N.Y.S.2d 4, 5, 8 (1st Dept.2002) (policy insuring against business interruption losses as a "direct and sole result of loss of, damage to or destruction of property or facilities" found to "clearly and unambiguously provide[ ] coverage only where the insured's property suffers direct physical damage"); *Bros., Inc. v. Liberty Mut. Fire Ins. Co.*, 268 A.2d 611, 613–14 (D.C.1970) (requiring physical damage or destruction

---

**6.** Moreover, UAL's reading of the Civil Authority clause would likely compel the conclusion that business interruption losses could be covered when access to an Insured Location is prohibited by order of civil authority as a result of economic damage to an adjacent premises. *See Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.

1989); *Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir.1985) ("A Court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings.") (citation omitted).

of property in context of civil authority provision); *Allen Park Theatre Co. v. Mich. Millers Mut. Ins. Co.*, 48 Mich.App. 199, 210 N.W.2d 402, 406 (1973) (same).[7]

### (B) Destruction of WTC Ticket Counter and Accumulation of Ash at Reagan Airport Gate

■ UAL argues that "[e]ven if 'physical' damage is the exclusive trigger for [business interruption] coverage . . ., UAL manifestly and indisputably suffered physical damage by any reasonabl[e] definition" when (i) its ticket counter in the WTC was destroyed; and (ii) UAL's "gate property at [Reagan Airport] was physically impacted . . . resulting in the accumulation of ash." (UAL Motion at 19; UAL 56.1 Stmt. ¶ 38.) UAL contends that these incidents constitute damage or destruction under the Policy, thereby entitling UAL to system-wide business interruption recovery, because "[n]othing in the Terrorism Policy purports to require physical damage at each and every insured location . . ." (UAL Motion at 20.)

ISOP does not dispute that UAL's ticket counter in the WTC was destroyed and has "offered to indemnify UAL for any loss of gross earnings it can identify as resulting from the destruction of that ticket counter." (ISOP Opp'n at 10–11 n. 11.) "The damage to that one ticket counter, however, did not cause the ground stop order or the denial of access to UAL's airport facilities" and, thus, ISOP argues, UAL is not entitled to system-wide loss of gross earnings based on this claim. (*Id.*) With regard to Reagan Airport, ISOP as-

serts that "the amount of debris that landed at the airport as a result of the fire at the Pentagon was minimal and was not a factor in the suspension of flights at that or any other airport." (*Id.* at 12.)

UAL's position that destruction of its ticket counter in the WTC and/or an "accumulation of ash" at Reagan Airport triggers coverage for system-wide business interruption losses approaching $1.2 billion is untenable because the amount of recovery sought bears no relation to the actual damage suffered at the WTC Insured Location. *See Harry's Cadillac–Pontiac–GMC Truck Co. v. Motors Ins. Corp.*, 126 N.C.App. 698, 486 S.E.2d 249, 251 (1997) ("The business interruption clause does not cover all business interruption losses, but only those losses requiring repair, rebuilding, or replacement."); *Howard Stores Corp. v. Foremost Ins. Co.*, 82 A.D.2d 398, 401, 441 N.Y.S.2d 674 (N.Y.App.Div.1981), *aff'd*, 56 N.Y.2d 991, 453 N.Y.S.2d 682, 439 N.E.2d 397 (1982) ("Plainly the policy in suit was not intended to include business interruption, if any, to [two of insured's] other stores where no physical damage occurred."); *see also Nat'l Union Fire Ins. Co. of Pittsburgh v. Am. Re–Ins. Co.*, 351 F.Supp.2d 201, 210 (S.D.N.Y.2005) ("court 'must take the opportunity to prevent an absurd and unreasonable result—one that was never clearly intended by the parties' ") (citation omitted); *Gen. Assurance Co. v. Schmitt*, 265 A.D.2d 299, 300, 696 N.Y.S.2d 72 (N.Y.App.Div.1999) ("The interpretation must reflect 'the reasonable expectation

---

7. The cases relied upon by UAL are unpersuasive. For example, *U.S. Airways v. Commonwealth Ins. Co.*, No. 03–587, 2004 WL 1094684 (Va.Cir.Ct. May 14, 2004), involved interpretation of a civil authority clause that contained broader language than here. *Id.* at *1, 3–5 (business interruption losses covered "when, as a direct result of a peril insured against, access to real or personal property is

prohibited by order of civil or military authority"). *New Market Inv. Corp. v. Fireman's Fund Ins. Co.*, 774 F.Supp. 909 (E.D.Pa. 1991), involved interpretation of an Open Marine Cargo Policy for "destruction of, or damage to" shipments of grapes from Chile "caused by vandalism, sabotage, or malicious act." *Id.* at 912–14.

and purpose of the ordinary business man when making an insurance contract' and the meaning 'which would be given it by the average man' "). The result pressed by UAL is not supported by language in the Policy requiring direct correlation between the amount of recovery and actual damage suffered. (*See, e.g.,* Policy at 00011 ("Payment will not exceed the amount actually spent to repair or replace ...;" "Company ... liable ... for only such length of time ... to rebuild, repair or replace;" Policy insures "against loss resulting directly from the necessary interruption of business caused by damage to or destruction of the Insured Locations").)

Nor does the Policy support the conclusion that UAL is entitled to Reagan Airport business interruption losses as a result of an "accumulation of ash at the United gates." (UAL 56.1 Stmt. ¶ 38.) The Policy covers business interruption losses "for only such length of time as would be required ... to rebuild, repair or replace such part of the Insured Location(s) as has been damaged or destroyed." (Policy at 00011.) There is nothing in the record presented by Plaintiff to indicate that UAL's gates required rebuilding, repair or replacement and, if so, for what period of time. *See* Deposition Tr. of Carol Fernandez dated Feb. 10, 2004, Ex. F to Weinstein Aff., at 153 ("Q: Was any repair needed to any property [at Reagan Airport] as a result of the terrorist attack? A: From a physical standpoint, no, I don't believe so."); Deposition Tr. of Christopher U. Browne dated Apr. 20, 2004, Ex. G to Weinstein Aff., at 88 ("Browne Dep. Tr.") ("Q: But there was burning debris landing on the airport property? A: Soldering debris. Q: And how was it removed? A: People picked it up."); *see*

*also Harry's Cadillac–Pontiac–GMC Truck Co.,* 486 S.E.2d at 251.[8]

**(C) Civil Authority Claim: Adjacent Premises**

██ ISOP argues that "the 'civil authority' provision does not provide coverage for UAL's Reagan Airport losses" because (i) "UAL cannot establish as a matter of law, English, or common sense, that its insured locations within [Reagan Airport] are 'adjacent' to the Pentagon" because "[t]he Pentagon is located approximately six miles from [Reagan Airport] by car," the two facilities do "not touch or abut at any point," and they are "separated by the Crystal City apartment complex, three highways, an active railway, fifteen identifiable parcels of property ..., a waterfowl sanctuary, and a wooded area," ISOP Opp'n at 19–20; and (ii) UAL cannot establish "a direct causal connection" between the damage at the Pentagon and the order of civil authority that suspended flight operations because "the initial grounding of flights and the subsequent decision to keep flight operations suspended ... until October 4, 2001 ... were designed to prevent further attacks and as a matter of national security," ISOP Opp'n at 18–23. ISOP also states that this issue is appropriate for summary judgment because "[t]here are no material questions of fact, inasmuch as the location of [Reagan Airport] and the Pentagon, the proximity of those two facilities to each other, the parcels, facilities, land features, and structures in between, and the language of the Policy all are undisputed." (ISOP Sur-Reply at 6.)

UAL agrees that its Civil Authority claim depends upon "(1) whether the Rea-

---

8. This issue was raised by Defendant (not UAL), who argued that "[t]he undisputed record ... demonstrates that UAL's characterization is a gross exaggeration; the amount of debris that landed at the airport ... was minimal and was not a factor in the suspension of flights at that or any other airport." (ISOP Opp'n at 12.)

gan Airport premises and Pentagon premises are 'adjacent' to one another; and (2) whether the closure of Reagan Airport was a direct result of the terrorist attack on the Pentagon and the resulting damage." (UAL Reply at 5–6.) UAL contends that Reagan Airport and the Pentagon are "adjacent premises" because, among other things, they are "so close that burning debris from the 9/11 fire at the Pentagon landed on the Airport (and specifically at UA[L]'s gate)" and "[Reagan] Airport's fire fighting equipment . . . was dispatched to extinguish the inferno at the Pentagon." (*Id.* at 8.) UAL further contends that "[a]s to the Policy's condition that insured locations be closed 'as a direct result of damage to adjacent premises', Chris Browne (MWAA's officer in charge of Reagan Airport) established causation during his deposition." (*Id.*) UAL asserts that its "claim for the extended closure of Reagan Airport presents disputed factual issues that cannot be resolved on ISOP's cross-motion or without a trial." (*Id.* at 5.)

The Court finds that neither the term "adjacent" nor the term "direct result of damage" contained in the Civil Authority clause of the Policy is ambiguous. *See Mostow v. State Farm Ins. Cos.*, 88 N.Y.2d 321, 645 N.Y.S.2d 421, 668 N.E.2d 392, 394 (1996) ("the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech") (citations omitted); *see also Syufy Enters. v. Home Ins. Co. of Ind.*, No. 94–0756, 1995 WL 129229, at *2–3 (N.D.Cal. Mar.21, 1995) ("Based on the plain and unambiguous language of the provision, the following situation would clearly be covered: A building next door to [an insured location] is damaged by fire; for safety reasons, the civil authorities issue an order closing the [insured location] during repairs to the adjacent building. Any business loss suffered by [the insured] for up to two weeks would be covered under the business interruption provision.").

The ordinary ("common speech") meaning of "adjacent" is "lying near, close or contiguous, neighboring, [or] bordering on." *Stanley Co. of Am. v. McLaughlin,* 195 F.Supp. 519, 522 (D.D.C.1961); *see also In re Needham,* 354 F.3d 340, 347 (5th Cir.2003) ("(a) not distant or far off: nearby but not touching; (b) relatively near and having nothing of the same kind intervening: having a common border: abutting, touching: living nearby or sitting or standing relatively near or close together; and (c) immediately preceding or following with nothing of the same kind intervening") (citing *Webster's Third New International Dictionary* 26 (1986)). UAL acknowledges that the Pentagon and Reagan Airport are "not adjoining or contiguous;" that "there are buildings, roads, and parcels of land" between them; that "the approximate driving distance from the Pentagon to Reagan Airport is 3.4 miles;" and that "the distance between the Pentagon 'premises' and the Airport 'premises'" is (by its calculation) "2,500 feet, or less than 1/2 mile." (UAL 56.1 Resp. ¶ 14.) Having examined the record on summary judgment, including the Policy as a whole, and the maps, aerial photographs, affidavits, driving directions and boundary information submitted by both parties, the Court cannot reasonably find that the Pentagon and Reagan Airport are "adjacent." Among other things, the Pentagon is (at least) 3.4 miles away by car from Reagan Airport and the two facilities are separated by several intervening structures and properties (that do not appear to have suffered any physical damage). (*See, e.g.,* Affidavit of Mark S. Albanese dated July 1, 2004 and accompanying exhibits; Declaration of Maria P. Logan dated May 5, 2004 and accompanying exhibits; Exs. C & I to Declaration of Geof-

frey J. Greeves dated July 23, 2004; Ex. P. to Weinstein Aff.)

In *Syufy Enterprises,* a movie theater chain filed an action against its insurer under an identical civil authority provision, as here, claiming business interruption losses associated with "dawn-to-dusk curfews imposed by several cities following the return of the Rodney King verdict" over a two to three day period. 1995 WL 129229, at *1. Plaintiff argued that the word "adjacent" in the insurance policy was ambiguous and that "property damage occurring anywhere within the curfew zones [was] sufficiently 'adjacent' to the Syufy theaters for purposes of triggering coverage." *Id.* at *2. The court found the term "adjacent" unambiguous and stated that "the 'ordinary and popular' reading of the term 'adjacent' denotes a sense of physical proximity. Damage occurring in an unspecified area at least two blocks from a Syufy theater is clearly and plainly not 'adjacent' to the theater." *Id.; see also Nycal Corp. v. Inoco PLC,* 988 F.Supp. 296, 301 (S.D.N.Y.1997), *aff'd,* 166 F.3d 1201, 1998 WL 870192 (2d Cir.1998) ("The purpose of contract interpretation ... is to determine the intentions of the parties.").

Assuming *arguendo* that the Pentagon and Reagan Airport were adjacent, UAL still must show that damage at the Pentagon was the "proximate, efficient and dominant cause" for the order of civil authority that barred access to Reagan Airport until October 4, 2001. *See Album Realty Corp. v. Am. Home Assurance Co.,* 80 N.Y.2d 1008, 592 N.Y.S.2d 657, 607 N.E.2d 804, 805 (1992). "In the context of insurance policies, 'the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings.' " *Great Northern Ins. Co. v. Dayco Corp.,* 637 F.Supp. 765, 778 (S.D.N.Y.1986) (citation omitted); *see also*

*Pan Am. World Airways v. Aetna Cas. & Sur. Co.,* 505 F.2d 989, 1006 (2d Cir.1974).

Nothing in the record supports UAL's contention that access to Reagan Airport was barred until October 4, 2001 "as a direct result of damage" to the Pentagon, or that Reagan Airport was reopened on that date because damage to the Pentagon had been repaired or rebuilt. (*See, e.g.,* Browne Dep. Tr. at 87) ("Q: Were you concerned from an operational standpoint about the debris that was emanating from the Pentagon and impacting the airport property here? ... A: Not specifically.") On the other hand, the record does support the conclusion that access to Reagan Airport was barred until October 4, 2001 in order to "prevent further attacks and as a matter of national security." ISOP Opp'n at 22; *see, e.g.,* "Memorandum of Understanding between U.S. Department of Transportation and Metropolitan Washington Airports Authority on Assistance for Ronald Reagan Washington National Airport" dated Dec. 6, 2001, Ex. 19 to Greeves 5/28/04 Decl. ("Because of the location of [Reagan Airport] and the airport's flight paths that take aircraft near the White House, Pentagon, Capitol, and other facilities in the Nation's capital, the Federal Government required that [Reagan Airport] remain completely closed until October 4, 2001, when a phased reopening began."); Letter from U.S. Department of Justice to Weinstein dated Feb. 17, 2004, ¶ 2 ("Once the enhanced security measures were in place, the Secretary of Transportation coordinated closely with the National Security agencies and [the Department of Defense] to reopen Reagan National."); *see also City of Chicago v. Factory Mut. Ins. Co.,* No. 02–C–7023, 2004 WL 549447, at *4 (N.D.Ill. Mar.18, 2004) ("[T]he business interruption ... was due to the ground stop order imposed by the FAA in order to prevent further terrorist attacks ..."); *Syufy Enters.,* 1995 WL 129229, at

*2 ("requisite causal link between damage to adjacent property and denial of access to [insured location] absent" where "curfews were imposed to *prevent* 'potential' looting, rioting, and resulting property damage" and not "as a direct result of adjacent property damage") (emphasis in original).

Christopher Browne's testimony did not establish "causation," as UAL suggests. Rather, Mr. Browne's testimony supports the conclusion that the "proximate, efficient and dominant cause" of both the initial and extended closure of Reagan Airport was "related to security measures." (*See, e.g.,* Browne Dep. Tr. at 144 ("Q: Do you have an understanding as to why [Reagan Airport] was reopened in phases rather than just allowed to return to pre–9/11 levels all at one[ ] time?" A: "It related to security measures."); Browne Dep. Tr. at 89 ("Q: Did you consider the airport premises to be part of the crime scene that was unfolding on September 11? A: I certainly felt that this airport was at risk, at risk for further attack, which again was the reason for evacuating it in the first place.").)

"Having determined that [the contract] is unambiguous, we have no reason to consider extrinsic evidence or the applicability of the *contra proferentem* rule." *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.,* 994 F.2d 105, 109 (2d Cir.1993).[9] However, assuming *arguendo* that the Court were to find the language in the Civil Authority clause ambiguous and resort to extrinsic evidence, the record would be unenlightening—and the outcome the same—because "neither party has presented any extrinsic evidence as to their [actual] intent." ISOP Sur–Reply at 7; *see Williams & Sons Erectors, Inc. v. Mars*

**9.** "[T]he rule of *contra proferentem* ... generally provides that where an insurer drafts a policy 'any ambiguity in the policy should be resolved in favor of the insured.'" *Morgan*

*Assocs., Inc.,* 983 F.2d 1176, 1183–84 (2d Cir.1993) ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on."); *Antilles Steamship Co. v. Members of the Am. Hull Ins. Syndicate,* 733 F.2d 195, 204 (2d Cir. 1984) ("issues of textual interpretation, in the absence of extrinsic evidence of the parties' intent, are really not issues of fact in any meaningful sense of that term") (Newman, J., concurring).

## V. Conclusion and Order

For the foregoing reasons, UAL's motion for summary judgment [25] is denied and ISOP's cross-motion for summary judgment [34] is granted. The Clerk of Court is respectfully requested to close this case.

*Stanley Group Inc. v. New England Ins. Co.,* 225 F.3d 270, 276 (2d Cir.2000) (citation omitted).