**UNITED AIR LINES, INC., Plaintiff–Counter–Defendant–Appellant,**

v.

**INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, Defendant–Counterclaimant–Appellee.**

**Docket No. 05–2144 CV.**

United States Court of Appeals, Second Circuit.

Argued: Jan. 10, 2006.

Decided: Feb. 22, 2006.

Elliot H. Scherker, Greenberg Traurig, P.A. (Pamela A. DeBooth; Peter M. Gillon, Geoffrey J. Greeves, Simon Miller, John F. Triggs, Greenberg Traurig, LLP; of counsel), Miami, FL, for Appellant.

Jeffrey Weinstein, Mound Cotton Wollan & Greengrass (Eugene Wollan, Mark S. Katz, of counsel), New York, NY, for Appellee.

alien to address the problems in his asylum application, without having them called to his attention.

Before: WINTER, CABRANES, and SACK, Circuit Judges.

SACK, Circuit Judge.

On July 14, 2003, the plaintiff, United Air Lines, Inc., ("United") brought suit in the United States District Court for the Southern District of New York seeking a declaratory judgment and recovery in breach of contract under its $25 million "Property Terrorism & Sabotage" insurance policy with the defendant, Insurance Company of the State of Pennsylvania ("ISOP"). United sought indemnity for losses it suffered as a result of the September 11, 2001, terrorist attacks on the World Trade Center in New York City and the Pentagon in Arlington, Virginia.

United's ticket office located in the World Trade Center was destroyed. It is undisputed that United can recover from ISOP for any lost earnings that are attributable to this physical damage. Its facilities at Ronald Reagan Washington National Airport (the "Airport"), in Arlington, Virginia, suffered no significant physical damage as a result of the attack on the nearby Pentagon. The issue on this appeal is whether United can nonetheless recover for its lost earnings caused by the national disruption of flight service and the government's temporary shutdown of the Airport.[1] We agree with the district court that, because United cannot show that such lost earnings resulted from physical damage to its property or from physical damage to an adjacent property, under the unambiguous language of the insurance policy, the losses are not covered.

## BACKGROUND

The first section of United's "Property Terrorism & Sabotage" insurance policy

with ISOP states in pertinent part: "[ISOP] will indemnify [United] for property damage, loss of gross earnings, and extra expense in excess of the Deductible [as later defined] ... resulting from [terrorism], and any ensuing fire damage, damage from looting, or other damage caused by an act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of [an incident of terrorism]." Property Terrorism & Sabotage Insurance Policy between ISOP and United, set forth as Exhibit A to Aff. of Jeffrey S. Weinstein dated July 9, 2004 (the "Policy"), § I.A. A subsequent section of the Policy provides that the Policy "insures against loss resulting directly from the necessary interruption of business caused by damage to or destruction of [United's] Insured Locations [which include United's facilities at both the World Trade Center and the Airport] resulting from Terrorism." *Id.*, § III.C.1. The Policy then states that "[t]his section is specifically extended to cover a situation when access to the Insured Locations is prohibited by order of civil authority as a direct result of damage to adjacent premises." *Id.*

United seeks a declaratory judgment pursuant to 28 U.S.C. § 2201(a) and an award of damages for breach of contract against ISOP. In this pursuit, it made two principal arguments to the district court to support its position that the cited provisions of the Policy entitle it to compensation for the lost earnings at issue. First, it argued that section I., quoted above, contains within it a free-standing "Suppression Damages Clause,"[2] which covers

---

**1.** As of August 2002, United had received $782 million in federal aid under the Air Transportation Safety and System Stabilization Act of 2001, 49 U.S.C. § 40101. United's remaining unreimbursed losses allegedly total approximately $400 million.

**2.** "[ISOP] will indemnify [United] for ... loss of gross earnings ... resulting from [terror-

United's lost earnings resulting from the terrorist attacks even in the absence of physical damage to its Airport property. Second, United argued that it is entitled to recover for lost earnings arising from the post-attack shutdown of the Airport under the "Civil Authority Clause" contained in section III.C.1. of the Policy because the closure was a direct result of physical damage to the Pentagon, which was on "adjacent premises." ISOP asserts seven counterclaims and seeks a declaratory judgment that it is not obligated to reimburse United for the disputed portion of its lost earnings.

On March 31, 2005, in a thorough and thoughtful opinion, the district court (Richard M. Berman, *Judge* ) granted ISOP's motion for summary judgment and denied United's cross-motion for summary judgment. The court concluded that the plain and unambiguous terms of the Policy did not cover the claims that United asserted. *See United Airlines, Inc. v. Ins. Co. of the State of Pa.*, 385 F.Supp.2d 343 (S.D.N.Y. 2005).

First, the court reasoned, paragraph III. C.1. of the Policy states that the Policy covers losses from business interruption "caused by damage to or destruction of the Insured Locations." United could (as both parties agreed) therefore recover the amount of losses attributable to the destruction of its ticket office in the World Trade Center. But because the other loss of earnings was caused by the nation-wide suspension of air service rather than "damage to or destruction of [a United] Location[ ]," United could not recover under the Policy for earnings lost as a result of the system-wide disruption of air service. *See United Airlines*, 385 F.Supp.2d at 348–50.

Second, the court noted that under the Policy's "civil authority" clause in paragraph III.C.1., United would not have been required to show physical damage to its property had it been seeking to recover for damages resulting from blocked access to its Airport property as "a direct result of damage to adjacent premises." But the district court rejected United's argument that the Pentagon qualified as an "adjacent premise" to the Airport for purposes of this paragraph. The court further concluded that, even if the Pentagon were "adjacent" to the Airport, the closing of the Airport and consequent lost earnings incurred by United were not direct results of the physical damage to the Pentagon. *See id.* at 351–54.

United appeals.

## DISCUSSION

I. Standard of Review and Governing Law

"We review a district court's grant of summary judgment de novo, construing the evidence in the light most favorable to the nonmoving party and drawing all inferences and resolving all ambiguities in favor of the nonmoving party." *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir.2005) (internal quotation marks and citations omitted). Whether the language in an insurance contract is ambiguous is also a question of law subject to our de novo review. *Haber v. St. Paul Guardian Ins. Co.*, 137 F.3d 691, 695 (2d Cir.1998).

The Policy is, according to its choice-of-law provision, governed by New York law. Neither party disputes the applicability of New York law to this dispute.

ism] ... or other damage caused by an act of a lawfully constituted authority for the purpose of suppressing ... [an incident of terrorism]." Policy, § I.A.

## II. Recovering Loss of Gross Earnings Under the "Suppression Damages Clause"

"The purpose of business interruption insurance is to indemnify the insured against losses arising from an inability to continue normal business operations and functions due to damage sustained as a result of the hazard insured against. In other words, the goal is to preserve the continuity of the insured's earnings." N.Y. Jur. Insurance § 539 (2005); *see also Archer Daniels Midland Co. v. Hartford Fire Ins. Co.*, 243 F.3d 369, 371 (7th Cir. 2001) ("Regular business-interruption insurance replaces profits lost as a result of physical damage to the insured's plant or other equipment . . . .") (quoted in *Zurich Am. Ins. Co. v. ABM Indus., Inc.*, 397 F.3d 158, 168 (2d Cir.2005)). Although the Policy's business interruption clause requires that the loss of earnings stem from physical damage to United's property, a "civil authority" clause extends the Policy's coverage to instances in which United is unable to reach its property as a result of physical damage to an adjacent property. The complete provision reads:

## III. VALUATION

. . . .

### C. BUSINESS INTERRUPTION

### 1. GROSS EARNINGS

This policy insures against loss resulting directly from the necessary interruption of business caused by damage to or destruction of the Insured Locations resulting from Terrorism, Sabotage, Mutiny, Insurrection, Rebellion, or Coup d'Etat.

This section is specifically extended to cover a situation when access to the Insured Locations is prohibited by order of civil authority as a direct result of damage to adjacent premises, not ex-ceeding, however, two (2) consecutive weeks.

Policy, § III.C.1.

To recover gross earnings under this language, United would be required to demonstrate that the business interruption at issue resulted from either 1) physical damage to property at the insured location in question, i.e., the Airport, or 2) an order of civil authority as a direct result of physical damage to property adjacent to the insured location in question, i.e., United contends, the Pentagon. As explained in part III of this opinion, United is able to show neither.

United argues, however, that a third provision of the Policy, contained in section I.A.—what it calls the "Suppression Damages Clause"—provides a separate basis upon which it may recover from ISOP its loss of gross earnings without having to establish either of the foregoing prerequisites. United's argument in this respect fails because, simply put, there is no "Suppression Damages Clause."

The first section of the Policy states:

I. INSURING AGREEMENT

A. The Company will indemnify the Insured for property damage, loss of gross earnings, and extra expense in excess of the Deductible, but not exceeding the Limit of Liability, resulting from the following incidents, and any ensuing fire damage, damage from looting, or other damage caused by an act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of any of the following incidents, during the policy period:

1. Terrorism

2. Sabotage

3. Mutiny, Insurrection, Rebellion or Coup d'Etat Policy, § 1.A. We do not read this language as providing coverage separate and independent from that set forth elsewhere in the Policy.

The function of section I.A., read in the context of the Policy as a whole, is to serve as an introduction to the Policy. It indicates that the Policy covers three categories of damages: (1) "property damage," (2) "loss of gross earnings," and (3) "extra expense." Section III of the Policy, titled "Valuation," describes how these various types of damages should be calculated. For example, section III.B. ("Buildings and Contents") details how to calculate the value of damages to physical property. Section III.C.1. describes how to calculate "gross earnings." And section III.C.2. explains how to calculate "extra expense."

United argues, however, that section I.A. of the Policy actually provides coverage for *four* different categories of damage: 1) "property damage," 2) "loss of gross earnings," 3) "extra expense," *and* 4) "other damage caused by an act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of . . . Terrorism[,] Sabotage[,] Mutiny, Insurrection, Rebellion or Coup d'Etat." Thus, United contends that when the government closed the Airport in order to thwart possible airborne attacks, United suffered "other damage caused by an act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of . . . Terrorism," for which it is entitled to indemnification, under section I.A. of the Policy. We disagree.

This introductory section states that ISOP will indemnify United for certain specified types of damages resulting from certain specified causes. It sets forth three types of damages: physical damage, loss of gross earnings, and extra expenses. It then lists a variety of triggering events that may cause one or more of these kinds of damages. They are fire, looting, or acts of a "lawfully constituted authority for the purpose of suppressing or minimizing the consequences of," *inter alia,* "Terrorism."

These are triggering events for the three categories of damages—physical damage, loss of gross earnings, and extra expenses—each of which is further explained and limited by subsequent sections III.B., III.C.1., and III.C.2., respectively. The triggering events are *not* further categories of damages for which United is entitled to indemnity for loss of gross earnings free of the restrictions contained elsewhere in the Policy.

In other words, the Policy states that whenever there is an act of, *inter alia,* terrorism—or terrorism-caused fire, terrorism-caused looting, or an "act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of [an incident of terrorism]"— then United will be indemnified for its physical damages, loss of gross earnings, and extra expenses resulting therefrom. It does not provide that if there is an "act of a lawfully constituted authority for the purpose of suppressing or minimizing the consequences of [an incident of terrorism]," United is entitled to indemnity for any and all resulting loss, including loss of gross earnings, however caused and unlimited by the remaining terms of the contract.

Indeed, if the phrase "suppression damages" created a free-standing basis of coverage—one that was not restricted by the subsequent valuation sections—then, by the same logic employed by United here, any fire damage or damage from looting should also create a free standing right to recover loss of gross earnings unconstrained by the remainder of the Policy. The specific limitations contained in Section III of the Policy would then be surplusage. The Policy states that in calculating loss of gross earnings, United can recover for business interruptions caused by orders of civil authority in response to physical damage of an adjacent structure.

There would be no need for such a specific provision—providing a two-week maximum duration of coverage—if the separate "suppression damages" clause that United finds in section I.A. covered all losses attributable to orders of civil authority designed to suppress the effects of terrorism for an indefinite period of time. *Cf. Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 558 (2d Cir.2000) ("[A]n interpretation that gives a reasonable and effective meaning to all terms of a contract is preferable to one that leaves a portion of the writing useless or inexplicable.").

There is therefore no merit to United's argument that the district court improperly inserted the word "physical" between the words "other damages" in section I.A. According to that provision, United can indeed recover loss of gross earnings, as contrasted with loss of property through physical damage to the property, that it suffers as a result of a government exclusion order. But the scope of the economic damages it can recover for that business interruption must be determined by cross-reference to the section of the Policy that specifically deals with loss of gross earnings. And that section—section III.C.1—provides that, in order for ISOP to have the duty to indemnify United for lost earnings, the government action in question must either have physically damaged United's property or been caused by physical

damage to adjacent property.[3] Similarly, if in attempting to suppress or minimize the consequences of terrorism, the government were to order that United's physical property be destroyed, then United would be able to recover for that physical damage by cross referencing to section III.B., which specifies how to valuate loss of buildings and their contents. And if the government's attempt to suppress damages caused by terrorism resulted in "other expenses" as defined by the insurance policy, those other expenses would be calculated by cross-referencing section III. C.2.

There is, in sum, no validity to United's argument that there arises under section I.A. of the Policy a duty for ISOP to indemnify United for any and all damages of any kind whatsoever that result from the government's efforts to suppress terrorism. There is thus no duty on the part of ISOP under the policy to indemnify United for all damages it incurred, including lost earnings, that resulted from the government's decision to shut down nationwide air service for several days, and the Airport for several weeks, in the wake of the September 11 terrorist attacks.

## III. Recovering Loss Under the "Gross Earnings" Section of the Policy

As noted, United's property at the Airport was not physically damaged.[4] It

---

**3.** United cites a variety of cases in which courts have found that an insured business could recover under a civil authority clause even when it suffers no physical damages. True enough. Indeed, in this very policy United can recover under its own civil authority clause without showing any physical damages to its own property (as long as it shows physical damage to an adjacent property). But United wants to use those cases interpreting civil authority clauses to argue that it should also recover under its fictitious "Suppression Damages Clause"—which it describes as a "unique form of civil-authority

damage coverage," Appellant's Br. at 29—without suffering any physical damages. Because this "Suppression Damages Clause" does not exist, United's arguments are unavailing.

**4.** United argues—and ISOP disputes—that its "gate property" was physically damaged by the accumulation of ash as a result of the attack on the Pentagon. *See United Airlines,* 385 F.Supp.2d at 350–51. But, as the district court correctly noted, there is no evidence that this ash in any way caused the Airport's shutdown. *See* Deposition Transcript of

therefore cannot recover, with respect to its Airport location, for "damage to or destruction of the Insured Locations resulting from Terrorism" under section III. C.1. of the Policy. But the airline also seeks to recover under the "civil authority clause" of that section of the Policy for its loss of gross earnings during the government's suspension of flights into and out of the Airport. In order to do so, United must show that it was denied access to its "locations" at the Airport "as a direct result of damage to adjacent premises." The district court determined that the Pentagon does not qualify as an "adjacent premise" under this provision.

" 'As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading.' " *Haber*, 137 F.3d at 695 (quoting *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 572 (2d Cir. 1991)). United correctly points out that the term "adjacent" may indeed be ambiguous: two properties can be adjacent, it seems, without necessarily sharing a border, i.e., without "adjoining." *See, e.g., United States v. St. Anthony R.R. Co.*, 192 U.S. 524, 538–40, 24 S.Ct. 333, 48 L.Ed. 548 (1904) (noting that the word adjacent has "uncertain meaning" and declaring that "[i]t is very difficult to determine just where twilight ends and night begins, but it is easy enough to distinguish noon from midnight"). On the one hand, United argues persuasively that, under the circumstances, the distance between the two locations should be judged by the air-distance of less than 1 mile instead of the driving distance of 3.4 miles.[5] But on the other hand, as the district court pointed out, even judging the distance from an aerial photograph, the properties are still "separated by the Crystal City apartment complex, three highways, an active railway, fifteen identifiable parcels of property, a waterfowl sanctuary, and a wooded area." *United Airlines*, 385 F.Supp.2d at 351 (internal quotation marks omitted; alterations incorporated). ISOP also notes that, were we to conclude nonetheless that the Airport's outermost runway is adjacent to the Pentagon property line, the airport runway is not an "Insured Location" of United. United's facilities are inside the airport terminal, some 1.25 miles from the nearest boundary of Pentagon property.

Ultimately, though, we need not resolve whether the Pentagon is "adjacent" to United's property. Even if it is, United cannot show that the Airport was shut down "as a direct result of damage to" the Pentagon. There was apparently a temporary halt of flights into and out of the Airport on 9/11 before the Pentagon was struck.[6] The evidence also indicates, not surprisingly, that the government's subsequent decision to halt operations at the Airport indefinitely was based on fears of future attacks. *See* "Memorandum of Understanding between U.S. Department of Transportation and Metropolitan Washington Airports Authority on Assistance for

Christopher U. Browne dated Apr. 20, 2004, at 88 (quoted in *United Airlines*, 385 F. Supp 2d at 351) ("Q: But there was burning debris landing on the airport property? A: S[m]oldering debris. Q: And how was it removed? A: People picked it up.").

**5.** United also argues that firefighters from the Airport were dispatched to assist with the Pentagon, that the forensic team assigned to investigate the Pentagon attack landed at Reagan Airport, that the Airport's parking lots were used by Pentagon employees, and that ash from the Pentagon fire fell on the airport.

**6.** A chronology submitted as one of United's Exhibits in the district court states that at 9:26 a.m., "The FAA bans takeoffs of all civilian aircraft regardless of destination—a national groundstop" and that at 9:40 a.m., "American Flight 77 crashes into the Pentagon."

Ronald Reagan Washington National Airport" dated Dec. 6, 2001, Ex. 19 to Greeves Decl. dated May 28, 2004 ("Because of the location of [the Airport] and the airport's flight paths that take aircraft near the White House, Pentagon, Capitol, and other facilities in the Nation's capital, the Federal Government required that [the Airport] remain completely closed until October 4, 2001, when a phased reopening began."). The Airport was reopened when it was able to comply with more rigorous safety standards; the timetable had nothing to do with repairing, mitigating, or responding to the damage caused by the attack on the Pentagon. *See* Alan R. Miller, *Business Interruption Insurance: Current Issues,* 702 PLI Litig. & Admin. Practice Course Handbook Series 233, 267 (2004) ("Access may have been prevented to some property, but not because of the physical damage that occurred. For example, access may have been prohibited because of concerns over a possible further attack. In such a case, it cannot be considered due to physical damage of the type insured.").

In other words, suppose American Airlines Flight 77 that day had missed the Pentagon and smashed into a private office building a mile beyond, or some other similar property not very far from the Airport but clearly not "adjacent" to it. In light of the hijacking of the other airplanes that morning and the successful attack on the World Trade Center, it can hardly be doubted that the effect on subsequent flight operations generally, and United operations at the Airport in particular, would have been virtually identical.[7] The interruption to United's business following the attacks was, therefore, not the "direct result" of damage to adjacent premises.[8]

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

---

**7.** United quotes Christopher Browne's testimony indicating that the shutdown was implemented "[a]s a result of the incident at the Pentagon and its impact," Appellant's Reply Br. at 13. But the attack on the Pentagon "caused" the shutdown only in the sense that it made the government fearful of future attacks. As that same witness clarified, "[t]he decision to evacuate was the result of what the terrorists had demonstrated at the Pentagon and knowledge that other aircraft were suspect or in fact being high-jacked themselves." *See* Browne Dep. Tr. at 145.

**8.** In concluding that the business interruption was caused by fears of future attacks, not by the actual physical damage inflicted on the Pentagon, our analysis of causation is consistent with the decisions of other courts interpreting "civil authority" clauses after September ber 11. *See, e.g., The Paradies Shops, Inc. v. Hartford Fire Ins. Co.,* at 17, No. 1:03–CV–3154–JEC (N.D.Ga. Dec.15, 2004) ("[T]hough Order Two was in part a product of the terrorist-inflicted damage already in existence at the time the order was issued, the ground stop was ultimately imposed to protect against any further terrorist attacks. . . . [T]he Court finds that an order like Order Two that is designed to prevent, protect against, or avoid future damage is not a 'direct result' of already existing property loss or damage."); *City of Chicago v. Factory Mut. Ins. Co.,* 2004 WL 549447, *4 (N.D.Ill. Mar.18, 2004), 2004 U.S. Dist. LEXIS 4266, *12 ("The ground stop was ultimately imposed to protect against any further terrorist attacks like those that damaged and/or destroyed the World Trade Center and the Pentagon.").